J-A27004-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| POWER LINE PACKAGING, INC. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| HERMES CALGON/THG ACQUISITION LLC, FRANCO S. PETTINATO AND JOSEPH FALSETTI | |
| Appellants | No. 7 EDA 2016 |

Appeal from the Order Entered November 24, 2015
In the Court of Common Pleas of Bucks County
Civil Division at No(s): 2010-02341-36

BEFORE:  PANELLA, J., LAZARUS, J., and FITZGERALD, J.[*]

MEMORANDUM BY LAZARUS, J.:          **FILED JANUARY 10, 2017**

Hermes Calgon/THG Acquisition LLC, Franco S. Pettinato and Joseph Falsetti (collectively, Appellants) appeal from the order, entered in the Court of Common Pleas of Bucks County, which awarded Appellee Power Line Packaging, Inc. (Power Line) restitution, interest and storage fees based upon claims of unjust enrichment, quantum meruit, and piercing the corporate veil.  Upon careful review, we affirm based upon the opinions of the Honorable Gary B. Gilman.

This matter arises out of a failed business venture between the parties in which Appellants requested that Power Line manufacture a new product

_____

[*] Former Justice specially assigned to the Superior Court.

line of personal care products. Power Line allegedly spent over $62,000.00 in costs, plus significant time in development and production, for which Appellants failed to reimburse Power Line. Following a non-jury trial held on February 3 and 4, and September 4, 2014, the trial court found in favor of Power Line and awarded the company restitution in the sum of $101,137.21, plus prejudgment interest in the amount of $37,390.29. The court also awarded post-judgment interest in the amount of $16.63 per day and storage fees of $138.70 per month after October 2014.

Appellants filed timely post-trial motions, which the court denied on November 18, 2015. Thereafter, Appellants filed a timely notice of appeal[1] and court-ordered concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). On appeal, Appellants raise the following issues for our review:

1. Whether the trial court abused its discretion and/or erred as a matter of law in finding any justifiable reliance on the part of [Power Line] with respect to its claims of misrepresentation.

2. Whether the trial court abused its discretion and/or erred as a matter of law in finding, upon Power Line's claim for quantum meruit, 1) that Power Line conferred a benefit upon anyone, and/or 2) that anybody appreciated and/or retained any such benefit.

Brief for Appellant, at 2.

---

[1] Although the court denied the post-trial motions on November 18, 2015, notice of the order was not mailed to the parties until November 24, 2015. Accordingly, the filing of the notice of appeal on December 24, 2015, was timely.

We note that our role in reviewing

non-jury trial verdicts is to determine whether the findings of the trial court are supported by competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

***Rissi v. Cappella***, 918 A.2d 131, 136 (Pa. Super. 2007).

Instantly, the trial court made detailed findings of fact showing that Appellants engaged in a course of conduct that induced Power Line to manufacture the personal care product line and that Power Line justifiably relied upon Appellants' actions. Likewise, the court's determination to pierce the corporate veil of Hermes Calgon is supported by the record. ***See Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC***, 846 A.2d 1264, 1280, 1281 n.12 (Pa. Super. 2004) (corporate veil is pierced when one in control "uses that control or corporate assets to further one's own personal interests. . . . by intermingling his personal interests with the corporation's interests[;]" where appropriate, "the doctrine of piercing the corporate veil will be applied to a limited liability company.")

We find that the opinions by the Honorable Gary B. Gilman dated September 30, 2015, and February 24, 2016, comprehensively address the issues raised on appeal, and we affirm on that basis. We direct the parties to attach a copy of both decisions in the event of further proceedings.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 1/10/2017

164      BUCKS COUNTY LAW REPORTER

2016 BCBA      **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

# Power Line Packaging, Inc. v. Hermes Calgon/ THG Acquisition, LLC, et al.

Defendants appeal this court's order which found that the Defendants had been unjustly enriched as a result of unlawful failure to reimburse Plaintiff for expenses associated with development and manufacture of a product line of personal care consumer care products. This Court held that Defendants' issues raised on appeal are without merit. Appealed to the Superior Court.

*Civil law – Piercing a corporate veil – Admission of testimony of an expert – Quantum meruit – Quasi contract – Misrepresentation by defendant concerning a new product line.*

1. The elements necessary to prove unjust enrichment are: (1) benefits conferred on the defendant by the plaintiff; (2) appreciation of the benefits on defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value.

2. The trial court is vested with wide discretion in deciding whether to allow the admission of expert testimony into evidence, and is not subject to reversal absent a clear abuse of discretion.

3. While there is no clear test or well-settled rule in Pennsylvania as to when the corporate veil may be pierced and when it may not be pierced, courts have held veil piercing to be appropriate "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability from a crime." Pearson v. Component Tech Corp., 247 F.3rd 471 (3rd Cir. 2001).

4. The Commonwealth Court of Pennsylvania has enunciated four factors that must be considered if the business entity is to be disregarded and the corporate veil is to be pierced. Those specific factors are 1) undercapitalization; 2) failure to adhere to corporate formalities; 3) substantial intermingling of corporate and personal affairs and 4) use of the corporate form to perpetrate a fraud.

C.P. Bucks County, Civil Division, No. 2010-02341. Quantum meruit, Piercing corporate veil. Power Line Packaging, Inc. v Hermes Calgon/THG Acquisition, LLC et al.

*Matthew A. Lipman,* for the Plaintiff.

*William T. Dudeck,* Eastburn and Gray, P.C. for the Defendants.

GILMAN, J., February 24, 2016.

## OPINION

### I.     INTRODUCTION

Defendants, Hermes Calgon/THG Acquisition, LLC d/b/a SoleburyBrands, Franco S. Pettinato ("Mr. Pettinato"), and Joseph Falsetti ("Mr. Falsetti") (collectively referred to as "Defendants,") appeal from this Court's Decision and Order of September 30, 2015, which found in favor of Plaintiff, Power Line Packaging, Inc. ("Power Line") and against Defendants on Plaintiff's claims of Breach of Implied Contract, Promissory Estoppel, Quantum Meruit, Fraudulent Misrepresentation and Negligent Misrepresentation.[1]

---

[1] In our Decision and Order of September 30, 2015, we determined that Ms. Laura Barry, who was initially a named Defendant, was not an equity holder, officer, director or in control of Hermes Calgon/THG Acquisition, LLC, and was therefore not individually liable to Power Line. Accordingly, in this Opinion, "Defendants" refers to Hermes Calgon/THG Acquisition, LLC, Franco S. Pettinato and Joseph Falsetti.

A protracted non-jury trial took place on February 3 and 4, 2014, and on September 4, 2014. After voluminous post-trial submissions by the parties, this Court set forth extensive Findings of Fact, Conclusions of Law and an accompanying Decision and Order in our Opinion dated September, 30, 2015. (That Decision and Order is incorporated herein. A copy is attached hereto as Exhibit A.) We determined that the Defendants had been unjustly enriched as a result of unlawful failure to reimburse Plaintiff for expenses associated with development and manufacture of a product line of personal care consumer products for which Defendants and Plaintiff had entered into a binding contract. Those expenses were incurred by Plaintiff while developing the product line of personal care products, a mist, a lotion and a shave gel, with six fragrances each, and by purchasing requisite materials and supplies (the "Product Line").

We also determined that the corporate veil of Defendants' LLC should be pierced and that Defendants, Mr. Pettinato and Mr. Falsetti, should be held individually liable to Plaintiff, along with Defendant Hermes Calgon/THG Acquisition, LLC, for the losses Plaintiff has incurred as a result of Defendants' actions. Accordingly, we awarded Plaintiff Power Line the sum of $101,137.21, which represented reimbursement for expenses Plaintiff had incurred for materials, for labor, for design work, and for storage of materials. Further, we awarded Plaintiff prejudgment interest of $37,450.76, for a total award in favor of Plaintiff and against Defendants of $138,587.97 in restitution. In addition, we determined that interest was due in the amount of $16.63 per day from the date of the Order and that storage fees of $138.70 per month commencing in October 2014 were to be added to Power Line's award.

## II. PROCEDURAL AND FACTUAL BACKGROUND

The appellate court is referred to Section I of Exhibit A, attached hereto. We supplement the procedural and factual background as follows:

Following our Decision and Order of September 30, 2015, Defendants Hermes Calgon/THG Acquisition, LLC, Franco S. Pettinato and Joseph Falsetti filed a Motion for Post-Trial Relief on October 19, 2015, which was denied by this Court pursuant to an Order of November 18, 2015. Subsequently, on December 24, 2015, Defendants filed a Notice of Appeal to the Superior Court. However, the September 30, 2015 Decision and Order of this Court had never been reduced to judgment by any of the parties, so the Superior Court notified Defendants' counsel that his appeal was procedurally improper. According to the docket, this error was subsequently remedied, and on February 16, 2016, judgment was entered in favor of Plaintiff and against Defendants, in the amount noted in our Order of September 30, 2015. We submit this Opinion at this time, then, under the assumption that the Superior Court will consider Defendants' appeal on the merits.

On December 30, 2015, this Court Ordered Defendants to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa. R.A.P.1925 (b)(1). Defendants filed their Statement on January 16, 2016.

## III. STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

The Defendants' Concise Statement of Matters Complained of on Appeal, filed pursuant to Pa. R.A.P. 1925(b), is recited *verbatim,* as follows:

1. Whether this Court abused its discretion and/or erred as a matter of law in finding, as part of any liability of Defendants or anyone of them in this matter, any justifiable reliance on the part of Plaintiff, Power Line Packaging, Inc. ("Power Line").

2. Whether, as the underlying substantive basis for all liability in this matter, this Court abused its discretion and/or erred as a matter of law in finding, upon Power Line's claim for *quantum meruit,* where, as a matter of law 1) Power Line conferred no benefit(s) upon the Company; and 2) the Company did not appreciate and/or retain any benefit(s) from Power Line.

3. Whether this Court abused its discretion and/or erred as a matter of law in admitting the proffered expert testimony of Peter Fascia, Esquire, CPA, LLM.

4. Whether this Court abused its discretion and/or erred as a matter of law in piercing the Company's corporate veil in light of a) the properly admitted and credible evidence at trial and b) the controlling findings, conclusions and holdings set forth in ***Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC,*** 846 A.2d 1264, 1278 (Pa. Super. 2004)

5. Whether, in the alternative to the foregoing, this Court abused its discretion and/or erred as a matter of law in awarding Power Line any damages for labor or warehousing where the former was speculative and the latter has been incurred at its own election.

## IV. DISCUSSION

Our Findings of Fact and the Conclusions of Law upon which we based our decisions in this case have been set forth comprehensively in our 66 page Decision and Order, attached as Exhibit A. Since our Decision and Order addresses the majority of Defendants' issues complained of on appeal, our discussion herein is limited to supplemental explications of facts and law which support our decisions.

### A. Standard of Review

In establishing the standard and scope of review applicable in an appeal from a non-jury verdict, the Superior Court of Pennsylvania has stated that.

[o]ur appellate role in cases arising from non-jury trial verdicts is to determine whether the findings of the trial court are supported by

competent evidence and whether the trial court committed error in any application of the law. The findings of fact of the trial judge must be given the same weight and effect on appeal as the verdict of a jury. We consider the evidence in a light most favorable to the verdict winner. We will reverse the trial court only if its findings of fact are not supported by competent evidence in the record or if its findings are premised on an error of law.

Rissi v. Cappella, 918 A.2d 131, 136 (Pa.Super.2007) (citation omitted). The Superior Court has further indicated that:

> "We will respect a trial court's findings with regard to the credibility and weight of the evidence unless the appellant can show that the court's determination was manifestly erroneous, arbitrary and capricious or flagrantly contrary to the evidence." *Ecksel v. Orleans Const. Co.,* 519 A.2d 1021, 1028 (1987) (citation omitted).

J.J. DeLuca Co. v. Toll Naval Associates, 56 A.3d 402, 410 (Pa. Super. 2012).

**B.    This Court properly concluded that Power Line justifiably relied on Defendants' representations and misrepresentations when it agreed to and in fact did manufacture the new Product Line requested by Defendants.**

We reference our attached Decision and Order, noting that no less than 15 pages of facts have been cited which thoroughly address Defendants' fraudulent, deceptive, and negligent conduct, along with Power Line's justifiable reliance. See Exhibit A, Findings of Fact # 74 through # 194, pp. 13-28.

> To be justifiable, reliance upon the representation of another must be reasonable. Porreco v. Porreco, 571 Pa. 61, 811 A.2d 566, 571 (2002) (Opinion Announcing the Judgment of the Court). "Whether the party claiming to have been defrauded relied upon the false representation is a question of fact." Silverman, 533 A.2d at 114.

Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1189 (Pa. Super. 2005).

As fact-finder, we determined that Defendants set out on a course of conduct to induce Power Line to manufacture the personal care line. Power Line relied upon the misrepresentations of Defendants that they were operating as a well-funded business and with established contracts for selling the Product Line to third parties. The deceptive PowerPoint presentation made by Defendants for Plaintiff, along with the deceptive "Official Company Info" email Defendants sent to Plaintiff, were illustrative of Defendants' scheme. All of Power Line's efforts were engaged in the formulation, production and completion of the Product Line at Defendants' request,

168          BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

with deadlines which Defendants represented to Plaintiffs were necessary to meet requirements retailers had imposed upon Defendants. See Exhibit A, Conclusions of Law #89-115, pages 55-58. See also Conclusions of Law #120-128, pages 59-61.

Defendants' assertion that Power Line did not justifiably rely on Defendants' numerous representations and/or misrepresentations about Defendants' relationships with purported retailers and their ability to successfully market the new Product Line at stores such as Walgreens and Shoppers Drug Mart ("Shoppers") is wholly without merit. On the contrary, it is clear that Power Line reasonably and justifiably relied upon Defendants' misrepresentations to its detriment. Power Line suffered significant damages as a result thereof.

**C.     This Court properly concluded that Power Line conferred benefits upon Defendants whereby Defendants were unjustly enriched**

It is well-established that "[c]ourts sitting in equity hold broad powers to grant relief that will result in an equitable resolution of a dispute." Williams Twp. Bd. of Supervisors v. Williams Twp. Emergency Co., Inc., 986 A.2d 914, 921 (Pa. Cmwlth. 2009). In addition, "a trial court must formulate an equitable remedy that is consistent with the relief requested ... " *Id.* (citing North Mountain Water Supply Co. v. Troxell, 81 A. 157 (1911)).

A cause of action in quasi-contract for *quantum meruit,* a form of restitution, is made out where one person has been unjustly enriched at the expense of another. "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." AmeriPro Search, Inc. v. Fleming Steel Co., 787 A.2d 988, 991 (Pa. Super. 2001). Therefore, a claim of *quantum meruit* raises the issue of whether a party has been unjustly enriched, and in order to prove such claim a party must successfully prove the elements of unjust enrichment." Mitchell v. Moore, 729 A.2d 1200, 1202 (Pa. Super. 1999).

The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. Id.at 1203-1204.

The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather the most significant element of this equitable doctrine, which is whether the enrichment of the defendant is unjust. "The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." Styer v. Hugo, 619 A.2d 347 (1993), *aff'd*, 637 A.2d 276 (1994).

To sustain the claim of unjust enrichment, Power Line established that Defendants "wrongfully secured or passively received a benefit" that was "unconscionable" for them to retain. Mitchell, supra at 1204 (quoting Torchia v. Torchia, 499 A.2d 581, 582 (Pa. Super. 1985)). Here, Defendants requested and

induced Power Line to develop the Product Line for Defendants, and to purchase and store the requisite materials, with assurances that Power Line would be paid by Defendants for their expenditures and efforts. Power Line did so and conferred on Defendants the benefits of development of, formulation of, and manufacture of the Product Line, along with purchase of and storage of the necessary materials for Defendants' use. Although Defendants repeatedly assured Power Line that they would pay for the purchase and storage of the materials and for the formula development for the Product Line, Defendants failed to pay Power Line for anything. (See further discussion herein, Section F, infra.)[2].

Defendants' wrongful refusal to actually pay Plaintiff for the Product Line, which has resulted in Defendants not taking physical possession of it, should not result in Defendants being able to defeat this unjust enrichment finding. Power Line conferred substantial benefits upon Defendants, placing them in a position to profit from sale of the Product Line to third parties. Unfortunately, Defendants failed to consummate such sales, and such failure has continued to the present day. It is indisputable, however, that benefits have, indeed, been conferred upon Defendants by Plaintiff, and that Defendants have actual knowledge of these facts.

Accordingly, our conclusion that Defendants have been unjustly enriched at the expense of plaintiff Power Line is wholly supported by the credible evidence and the law.[3]

### D. This Court properly admitted the testimony of Plaintiff's expert Peter Fascia, Esquire, CPA, LLM

The only issue raised in Defendants' Statement of Errors Complained of on Appeal that was not exhaustively addressed in our September 30, 2015 Decision and Order, is the admission of the testimony of Power Line's expert accountant, Mr. Fascia. As explained more fully below, we concluded that Mr. Fascia's testimony was relevant and was properly admitted into evidence.

On January 22, 2014, Defendants filed a Motion in Limine to Preclude the Expert Testimony of Mr. Fascia. That Motion raised an issue that was reiterated in Defendants' Motion for Post-Trial Relief. Defendants asserted that Mr. Fascia's written report of July 29, 2013 supported their claim that he should not be permitted to testify as an expert witness in this matter because of the following:

  a.  Expert testimony is not necessary on these subjects of factual inquiry;

  b.  He is doing nothing more than acting as a sort of co-counsel and parroting the arguments of Power Line's counsel with a request that they now be received as and accorded the weight of the testimony;

  c.  He is invading the province of the fact-finder; and

---

[2] Additionally, see Exhibit A, Conclusions of Law #1-14, pp. 38-40.

[3] Note that we found Defendants liable to Plaintiff on several alternative theories, which included more than unjust enrichment, quantum meruit, and promissory estoppel. We also found Defendants liable for breach of implied contract, fraudulent misrepresentation, and negligent misrepresentation.

170                    BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

d.    Even if none of the foregoing were true, his opinions are not relevant to a limited liability company as opposed to a corporation.

(Defendants' Motion in Limine, 1/22/14, p. 2, Defendants' Motion for Post-Trial Relief, 10/19/15, p. 2)

At the outset of the trial we heard brief argument on Defendants' Motion in Limine. Understanding Defendants' concerns that Mr. Fascia is an attorney, we addressed the motion as follows:

> I understand that Mr. Fascia is an attorney, so there are some issues addressed in the report that come close to attorney opinions as opposed to economic opinions ...
>
> [t]he motion at this point is denied without prejudice to Mr. Dudeck (Defendants' counsel) raising objections given the testimony.

N.T. 2/3/14, pp 4-5.

Expert testimony is admissible under Pennsylvania Rule of Evidence ("Pa.R.E.") 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702.

A trial court is vested with wide discretion in deciding whether to allow the admission of expert testimony into evidence, and is not subject to reversal absent a clear abuse of discretion. Daddona v. Thind, 891 A.2d 786, 805 (Pa. Cmwlth. 2006).

Mr. Fascia is a Certified Public Accountant with an LLM in taxation. He also happens to be an attorney. As a CPA, he reviewed the relevant company formation documents, the Operating Agreement, and the financial records and tax returns of Defendant Hermes Calgon/THG Acquisition, LLC. He rendered opinions regarding the capitalization and solvency of the Hermes entity. Mr. Fascia expressed his professional opinion that the company did not adhere to traditional formalities necessary for the operation of a limited liability company, nor did it adhere to the requirements contained in the Operating Agreement. Mr. Fascia also opined on other technical accounting issues. This Court was aware that Mr. Fascia is an attorney as well as a CPA, and we were careful to evaluate his opinions only as they pertained to accounting as opposed to legal issues.

Mr. Fascia's testimony clearly related to issues that were beyond the skills and knowledge of a layperson. His opinions were provided following generally accepted accounting analysis. The weight to be afforded his expert testimony was a determination within this Court's discretion. Accordingly, Mr. Fascia's testimony was properly admitted into evidence, and Defendants' assertion that admission of his expert accounting opinions constituted an abuse of discretion is meritless.

**E.     This Court properly Pierced the Corporate Veil of Hermes Calgon/ THG Acquisition, LLC Based on the Testimony and Evidence Elicited, Along With Application of Pertinent Law**

While there appears to be no clear test or well-settled rule in Pennsylvania as to exactly when the corporate veil may be pierced and when it may not be pierced, courts have held veil-piercing to be appropriate "when the court must prevent fraud, illegality,or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." Pearson v. Component Tech. Corp., 247 F.3d 471, 484 (3d Cir. 2001). "It has been held that the corporate veil is properly pierced whenever one in control of a corporation uses that control or corporate assets to further one's own personal interests. In such circumstances, the shareholder, in effect, pierces the corporate veil by intermingling his personal interests with the corporation's interests." Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC, 846 A.2d 1264, 1280 (Pa. Super. 2004) (citing College Watercolor Group, Inc. v. William H. Newbauer, Inc., 360 A.2d 200, 207 (1976)). *See also* E. Comfort Assisted Living (ECAL) IV & V v. Department of Pub. Welfare, 2014 WL 546814 (Pa.Cmwlth. 2014).

Defendants rely on Advanced Telephone Systems, Inc. for the strong presumption in Pennsylvania against piercing the corporate veil. Defendants, however, disregard the significance of the fact that the same case also notes that "the Limited Liability Company Law of 1994 contemplates 'that in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company.' 15 Pa. C.S.A. § 8904, Committee Comment, 1994." Advanced Telephone Systems, supra at 1281, FN11.

In our Decision and Order of September 30, 2015, we considered the credible testimony presented by Power Line and the lack of credibility associated with testimony and evidence presented by the Defendants. The record revealed that all four factors (as enunciated by the Commonwealth Court of Pennsylvania) that must be considered, if the business entity form is to be disregarded and the corporate veil is to be pierced, existed in this case. Those specific factors are as follows: 1) undercapitalization;

2) failure to adhere to corporate formalities; 3) substantial intermingling of corporate and personal affairs and 4) use of the corporate form to perpetrate a fraud. Department of Environmental Resources v. Peggs Run Coal Co, 423 A.2d 765 (Pa. Cmwlth. 1980). See Exhibit A, Findings of Fact #195-262, pages 28-36, and Exhibit A, Conclusions of Law #15-83, pages 40-54.

172          BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

As noted in our Conclusion of Law #29, the Pennsylvania legislature clearly intended to permit application of the doctrine of piercing the corporate veil to a limited liability company (such as Defendant Hermes here) when it enacted the Pennsylvania Limited Liability Company Law, 15 Pa. C.S.A. §8901 et seq. The credible evidence convincingly established here that Defendant Hermes, LLC was undercapitalized, that Defendants failed to adhere to corporate formalities, that Defendants intentionally disregarded the company operating agreement, and that Defendant Mr. Falsetti, without distinction, commingled company funds with his personal funds. Further, the credible evidence convincingly established that the company was used to perpetrate fraud by paying insiders rather than a known creditor, Power Line, and that Defendants intentionally rendered the company insolvent.

We properly and lawfully determined, then, that this case was, in fact, an appropriate case where the doctrine of piercing the corporate veil should be applied to a limited liability company.

F.     **This Court properly awarded damages to Power Line for its labor incurred in creating the Product Line for Defendants, and for warehousing costs for storage of the Product Line**

Defendants approached Power Line to develop the Product Line and Defendants supplied Power Line with a spreadsheet labeled "Shoppers," a third party retailer, that listed the required quantities of the various Product Line items. The PowerPoint that Defendants presented to Power Line boasted "the Company's U.S. based success is in partnership with America's largest drug sector retailer Walgreens with excess of 6,000 stores across the country." Although, in reality, Defendants had not consummated either of the suggested binding partnerships or contracts with third parties, or any similar relationships with others, Power Line reasonably relied upon such representations, and developed and produced the Product Line, incurring costs associated with "hundreds of hours" of labor.

Defendants sent e-mail messages to Power Line stating that "it's time to rock and roll" and reminded Power Line of dates that needed to be met, given certain production requirements. These directions reinforced Power Line's efforts in product formulations, production, and purchase of supplies, which were reasonably commensurate with the representations made by Defendants.

Power Line purchased 65,000 tubes, 63,000 sprayers, 41,000 unit cartons, and 131,000 labels in coordination with the anticipated production for Defendants. Defendant Mr. Pettinato was aware, based upon discussions with Power Line representatives, that Power Line was purchasing thousands of "long lead item" component parts. Testimony revealed that Defendants, on at least four occasions, represented that they would reimburse Power Line for the costs of the components.

These components were stored on 38 pallets, each six feet high. On July 16, 2009, Mr. Pettinato sent an e-mail to Power Line representatives which stated, in part, that "the deal with Shoppers continues to be delayed, could you please fax me the invoices, and your estimate of how many pallets, I'm making arrangements with

a warehouse local for you to store the material." (Exhibit P-11) Unfortunately, to the detriment of Power Line, Defendants never made arrangements for warehousing. Accordingly, Power Line has necessarily incurred monthly warehousing costs since June 2009.

Power Line's labor efforts, which were billed to Defendants in the total amount of $30,000.00, were commensurate with the production needs that were dictated by Defendants. Since the alleged Shoppers deal never came to fruition, Power Line's production efforts for Defendants necessitated warehousing the Product Line, a fact of which Defendants were aware, and for which Defendants repeatedly claimed they would be financially responsible.

The evidence clearly establishes, then, that Defendants' assertions that Power Line's labor costs were based upon mere speculation, and that warehousing costs for products manufactured for Defendants were incurred at Power Line's own election, are meritless.

## V. CONCLUSION

Defendants have challenged this Court's Decision and Order of September 30, 2015, wherein we found that Defendants were unjustly enriched as a result of their failures, in their roles as the directors and the individuals principally in charge of Hermes Calgon/THG Acquisition, LLC, to pay Plaintiff Power Line for the expenses it incurred, at Defendants' request, in developing and manufacturing the Product Line, and purchasing the requisite materials and supplies. In addition, we determined that the corporate veil of the Defendant LLC should be pierced, and that Defendants Mr. Pettinato and Mr. Falsetti should be held individually liable to Power Line, along with Defendant Hermes Calgon/THG Acquisition, LLC, for the losses Plaintiff incurred as a result of Defendants' unlawful actions.

Accordingly, an equitable remedy of an award of restitution was appropriate. We found that Power Line should be awarded the sum of $101,137.21, in addition to prejudgment interest of $37,450.76, for a total award of $138,587.97. Further, we awarded interest in the amount of $16.63 per day from the date of the Order. Additionally, storage fees of $138.70 per month, commencing in October 2014, were appropriately added to the award.

Despite Defendants' unsubstantiated assertions that no fraudulent or negligent misrepresentations were made to Power Line, the record evidenced a strategic pattern of deception by Defendants which rendered Power Line the victim of Defendants' misconduct. All of Defendants' errors complained of on appeal are meritless. Accordingly, we respectfully submit that our Decision and Order of September 30, 2015 should be affirmed.

BY THE COURT:
/s/Gary B. Gilman
GARY B. GILMAN, J.

174          BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

## EXHIBIT A

## IN THE COURT OF COMMON PLEAS OF
## BUCKS COUNTY, PENNSYLVANIA
## CIVIL ACTION - LAW

POWERLINE PACKAGING, INC.                    :          No. 2010-02341
                                             :
                                             :
          v.                                 :
                                             :
                                             :
HERMES CALGON/THG ACQUISITION,               :
LLC, FRANCO S. PETTINATO,                    :
LAURA L. BARRY and JOSEPH FALSETTI           :

## DECISION AND ORDER
## I. INTRODUCTION AND PROCEDURAL BACKGROUND

On March 3, 2010, Plaintiff, Power Line Packaging, Inc. ("Power Line"), filed a Complaint against Defendants, Hermes Calgon/THG Acquisition, LLC d/b/a SoleburyBrands, Franco S. Pettinato ("Mr. Pettinato"), Laura L. Barry ("Ms. Barry") and Joseph Falsetti ("Mr. Falsetti") (collectively referred to as "Defendants"), setting forth various claims including Breach of Contract, Promissory Estoppel, Quantum Meruit, Negligent Misrepresentation and Fraudulent Misrepresentation. These claims stemmed from a failed business venture among the parties, in which Power Line had been requested to manufacture a new product line of personal care consumer products for which it allegedly spent $62,041.21 in costs to third party vendors, along with "hundreds of hours" working on the development and manufacture of the product line. It was alleged by Power Line that Defendants had failed to reimburse it for these efforts and expenses.

On April 13, 2010, Defendants filed Preliminary Objections to Plaintiff's Complaint, arguing insufficiency of the pleadings for failure to identify the specific terms and conditions of the contract, inclusion of inappropriate tort claims of fraudulent and negligent misrepresentation due to the gist of the action doctrine, and improper inclusion of the defendants, Mr. Pettinato, Ms. Barry and Mr. Falsetti, as individuals because they had conducted the subject business transactions as representatives of Hermes Calgon/THG Acquisition, LLC.

On May 6, 2010, Plaintiff filed an Amended Complaint, modifying the explanation of the underlying business transactions between the parties and alleging that Mr. Pettinato, Ms. Barry and Mr. Falsetti were executives of, and had traded as, Solebury Brands, LLC, "a holding company formed as a development and acquisition vehicle targeting branded consumer goods." The Amended Complaint included revised claims for Breach of Contract; Promissory Estoppel; Quantum Meruit; Negligent Misrepresentation and Fraudulent Misrepresentation, as well as a count seeking to Pierce the Corporate Veil.

On May 24, 2010, Defendants filed Preliminary Objections to Plaintiff's Amended Complaint, which essentially repeated the allegations contained in their first set of Preliminary Objections. On September 23, 2010, the Honorable Rea B. Boylan of this Court overruled Defendants' Preliminary Objections and directed them to file an Answer within twenty (20) days.

Defendants accordingly filed an Answer with New Matter on October 21, 2010, denying Plaintiff's allegations and averring that Mr. Pettinato, Ms. Barry and Mr. Falsetti had never acted or operated in their individual capacities.

On January 25, 2012, upon stipulation of counsel, Plaintiff filed a Second Amended Complaint, revising the counts and amending the case caption as to Defendants to "Hermes Calgon/THG Acquisition, LLC d/b/a SoleburyBrands, Franco S. Pettinato, Individually and d/b/a SoleburyBrands, Laura L. Barry, Individually and d/b/a SoleburyBrands and Joseph Falsetti, Individually and d/b/a SoleburyBrands." The revised counts included Breach of Contract (Count I), Promissory Estoppel (Count II) and Quantum Meruit (Count III) against Hermes Calgon/THG Acquisition LLC; Negligent Misrepresentation (Count IV) and Fraudulent Misrepresentation (Count V) against Franco S. Pettinato and Laura L. Barry; and Piercing the Corporate Veil (Count VI) against Franco S. Pettinato, Laura L. Barry and Joseph Falsetti.

On February 15, 2012, Defendants filed an Answer with New Matter denying Plaintiff's allegations, and asserting again that Mr. Pettinato, Ms. Barry and Mr. Falsetti acted only on behalf of Hermes Calgon/THG Acquisition, LLC, and not in any individual capacity.

On March 20, 2012, Defendants filed a Motion for Partial Summary Judgment, which was denied by Judge Boylan on September 5, 2012. Defendants filed a Motion for Reconsideration of the Denial of the Motion for Partial Summary Judgment on October 11, 2012, which Judge Boylan denied on October 19, 2012.

This case was ordered on the trial list for the week of August 8, 2013, re-scheduled for the week of October 9, 2013, and finally re-scheduled for the week of December 23, 2013. On January 22, 2014, Defendants filed a Motion in Limine to preclude the testimony of Plaintiff's proposed expert witness, Peter Fascia, Esquire CPA LLM.

Defendants' Motion in Limine was denied without prejudice prior to the start of the non-jury trial which was held, in front of the undersigned, over three days on February 3 and 4, 2014 and September 4, 2014. At the conclusion of the trial, the matter was taken under advisement and counsel were directed to submit proposed findings of fact and conclusions of law after receipt of the trial transcripts.

After determination and careful consideration of the facts and relevant case law, we conclude that Power Line is entitled to relief, and we enter an appropriate Order which follows the entry of our Findings of Fact and Conclusions of Law.

## II. FINDINGS OF FACT

### A. Power Line Packaging, Inc.

1. Power Line is a small, family-operated manufacturing and repackaging company that was started in 1988 and had gross revenue of approximately $5 million in 2009. (N.T. 2/3/14, pp. 29, 32, 99; Vernon Dep. 4/30/13, pp. 25-26.)

176        BUCKS COUNTY LAW REPORTER

2016 BCBA       **Power Line v. Hermes Calgon/THG**     [89 Bucks Co. L. Rep.

2.       Power Line develops and manufactures home care and personal care products such as soaps, lotions and body spray for clients, and it also repackages products for clients such as Lansinoh, International Vinyl Corporation and Elmer's. The end products are sold in stores such as Sam's Club and Wal-Mart. (N.T. 9/3/13, pp. 29-31; Vernon Dep. 4/30/13, pp. 9-14.)

3.       Power Line has a 31,000 square foot building in Conshohocken, Pennsylvania that has ten assembly lines, five to six mixing tanks, two packaging rooms and a warehouse. (N.T. 2/3/13, p. 32.)

4.       Lisa Johanningsmeier ("Ms. Johanningsmeier") is the daughter of the founder of Power Line. She is President of Power Line and handles the financial aspects of the company. (N.T. 2/3/14, pp. 32, 37, 39.)

5.       John Vernon ("Mr. Vernon") is Ms. Johanningsmeier's brother. He is the Vice President of Power Line and is generally in charge of the facilities. (N.T. 2/3/14, p. 33; Vernon Dep. 4/30/13, pp. 6-9)

6.       Kevin Parker ("Mr. Parker") is in charge of sales and purchasing for Power Line. (N.T. 2/3/14, p. 33; N.T. 2/4/14, p. 4.)

7.       Jaime Kocis ("Ms. Kocis") is in charge of quality control and regulatory compliance at Power Line and is the formulator/chemist for the personal care product lines. (N.T. 2/3/14, p. 34.)

8.       Power Line does not manufacture any products under its own label and has not partnered with any companies such that it would have an investment in any of the final products that it develops and manufactures. (N.T. 2/3/14, pp. 35-38.)

9.       Due to the Quaker culture of its founder, who was opposed to written contracts, Power Line has historically not required purchase orders when entering into business transactions with clients. As noted by Ms. Johnanningsmeier, the Power Line "culture" was to operate on consensus rather than formal written agreement. (N.T. 2/3/14, pp. 39-40, 104, 108.)

### B.    Hermes Calgon/THG Acquisition, LLC

10.     Mr. Pettinato was previously the senior vice-president of operations at Ascendia Brands, which owned personal care product brands such as Mr. Bubble, Binaca, Calgon and the Healing Garden. (N.T. 2/4/14, pp. 62-64)

11.     Mr. Pettinato left Ascendia in 2007, and Ascendia declared bankruptcy in 2008. (N.T. 2/4/14, p. 64)

12.     Mr. Pettinato and "a group of previous executives of Ascendia" formed Hermes Calgon/THG Acquisition, LLC (herein also referrred to as "the Company") to acquire the established personal care product brands Calgon and The Healing Garden from the bankruptcy sale of Ascendia Brands. (N.T. 2/4/14, pp. 63-67)

13.     Mr. Pettinato believed they would win the bid for the sale of Calgon and The Healing Garden brands; this is the purpose for which Hermes Calgon/THG Acquisition, LLC was formed. (N.T. 2/4/14, p. 67)

14.     Mr. Falsetti testified that Hermes Calgon/THG Acquisition, LLC was formed to acquire Calgon and The Healing Garden brands and not for any other purpose. (N.T. 2/4/14, pp. 215-216, 226)

**C. Organization and Capitalization of Hermes Calgon/THG Acquisition, LLC**

15. Hermes Calgon/THG Acquisition, LLC had an Operating Agreement signed by its members. (N.T. 2/4/14, pp. 72, 218-219, Exhibit P-23)

16. The members of Hermes Calgon/THG Acquisition, LLC were Mr. Pettinato, RSB, LLC, Brian Bradley and Simon Brown. (N.T. 2/4/14, pp. 74, 219, Exhibit P-23))

17. Mr. Falsetti was not listed as a member of Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 74, 219-220; Exhibit P-23)

18. Ms. Barry is not listed as a member of Hermes Calgon/THG Acquisition, LLC. (Exhibit P-23)

19. The directors of Hermes Calgon/THG Acquisition, LLC were Mr. Pettinato, Sherri Falsetti, who is Mr. Falsetti's wife, and Regina Massad. (N.T. 2/4/14, p. 78; Exhibit P-23)

20. Mr. Falsetti was not listed as a director of Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, p. 78; Exhibit P-23)

21. Ms. Barry is not listed as a director of Hermes Calgon/THG Acquisition, LLC. (Exhibit P-23)

22. According to the Operating Agreement, RSB, LLC made a capital contribution of $583,333.35 for 700,000 Class A Units and Mr. Pettinato made a capital contribution of $166,666.65 for 200,000 Class B Units, for a total capital contribution of $750,000.00. (Exhibit P-23)

23. In addition, 100,000 Class B Units were issued as follows: 25,000 Class B Units to Mr. Pettinato, 40,000 Class B Units to Brian Bradley, 25,000 Class B Units to Simon Brown and 10,000 Class B Units were reserved. (Exhibit P-23)

24. The General Ledger for Hermes Calgon/THG Acquisition, LLC indicates that $175,000 was initially deposited into the company bank account on November 19, 2008, and then immediately sent to the law firm Greenberg Traurig. (Exhibit D-3)

25. The following week, $550,000 was deposited to the bank account and then $500,000 was transferred to The Hermes Group. (Exhibit D-3)

26. The following day, an additional $550,000 was deposited from an unknown source and $175,000 immediately was provided to CWC Industries. (Exhibit D-3)

27. On cross-examination, Mr. Falsetti was unable to explain with any specificity where the initial funds for the company came from or who contributed them. (N.T. 9/4/14 pp. 138-140, 232-233)

28. Mr. Falsetti did not make a direct capital contribution to Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, p. 75-77; Exhibit P-23)

29. Ellen Sides ("Ms. Sides"), the mother of Sherri Falsetti and the mother-in-law of Mr. Falsetti, did not make a direct capital contribution to Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 76-78, 231-234; Exhibit P-23)

30. No units of Hermes Calgon/THG Acquisition, LLC were issued to Mr. Falsetti or to Ms. Sides. (N.T. 2/4/14, pp. 76-77, 220); Exhibit P-23)

31.    Mr. Pettinato testified that he was the President and Chief Operating Officer of Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 68-69, 72)

32.    Mr. Falsetti testified that he was appointed the CEO of Hermes Calgon/THG Acquisition, LLC and the "funding entity" RSB, LLC. (N.T. 2/4/14, p. 216)

33.    The identity of the CEO of Hermes Calgon/THG Acquisition, LLC was not documented in the Operating Agreement. (Exhibit P-23)

34.    The signature card for the Wachovia Bank account held by Hermes Calgon/THG Acquisition, LLC listed Mr. Falsetti as an "administrator" and not the CEO of Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 244-247; Exhibit P-26)

35.    Mr. Pettinato's position as President of Hermes Calgon/THG Acquisition, LLC was not listed in any of the documents entered into the record at trial.

36.    Mr. Pettinato acknowledged that it was his responsibility to operate the company in accordance with its Operating Agreement. (N.T. 2/4/14, p. 210)

37.    Mr. Falsetti testified that he was familiar with the Hermes Calgon/THG Acquisition, LLC Operating Agreement. (N.T. 2/4/14, p. 218)

38.    Mr. Falsetti was unaware of any amendments or revisions to the Hermes Calgon/THG Acquisition, LLC Operating Agreement. (N.T. 2/4/14, p. 219)

39.    Mr. Falsetti's position with Hermes Calgon/THG Acquisition, LLC was not listed in any of the documents entered into the record at trial.

40.    Laura Barry ("Ms. Barry) testified that she was Vice President of Marketing for the Solebury Brands company. (N.T. 9/4/14, pp. 7-8)

41.    Ms. Barry had worked previously for Mr. Pettinato and Mr. Falsetti as a marketing director at Ascendia Brands. (N.T. 9/4/14, p. 39)

42.    Ms. Barry testified that she did not know the full or official name of the company she was working for. (N.T. 9/4/14, p. 6)

43.    Ms. Barry acknowledged that correspondence between Mr. Pettinato and Mr. Parker at Power Line, on which she was copied, stated that the legal name of the company was "Hermes, LLC." (N.T. 9/4/14, p. 7; Exhibit P-3)

44.    Ms. Barry testified that she did not consider herself an officer of Hermes Calgon/THG Acquisitions, LLC. (N.T. 9/4/14, p. 8)

**D.    Defendants Approached Power Line to Develop the Product Line for Shoppers**

45.    Mr. Pettinato met with Mr. Parker and Mr. Vernon at Power Line in February 2009 to investigate the development and production of a personal care line consisting of three products—a mist, a lotion and a shave gel—with six fragrances each (the "Product Line"). (N.T. 2/3/14, p. 42; N.T. 2/4/14, pp. 5-6, 27.)

46.    Mr. Pettinato informed Power Line that the end user of the Product Line he wanted Power Line to manufacture was Shoppers Drug Mart ("Shoppers"), the largest Canadian drug store chain. (N.T. 2/3/14, pp. 59-60; N.T. 2/4/14, p. 7, 96.)

47.    Mr. Pettinato contacted Power Line because of its ability as a contract manufacturer of personal care products to produce "small runs" and specialty "alcohol mists". (N.T. 2/4/14, p. 51.)

48.    At the first meeting with Power Line on February 9, 2009 Mr. Pettinato introduced himself as a representative of "Solebury Brands." (N.T. 2/4/14, pp. 32-33)

49.    Defendants never used the name Hermes Calgon/THG Acquisition, LLC in their negotiations and business transactions with Power Line, and they were unaware of any documentation provided by Defendants to Power Line with that name on it. (N.T. 2/4/14, pp. 12, 32, 152, 252-253)

50.    Defendants nevertheless contend that in their dealings with Power Line, they were working on behalf of Hermes Calgon/THG Acquisition, LLC ("Hermes Calgon"). (N.T. 2/4/14, pp. 67-72, 215-217)

51.    Within a day of their initial meeting, Mr. Pettinato supplied Power Line with a spreadsheet dated February 4, 2009 and labeled "Shopper" that listed required quantities of the various items associated with the Product Line. (N.T. 2/4/14, pp. 6-7, 9-10; Exhibit P-22)

52.    As a result of that meeting, Power Line believed that Mr. Pettinato and Solebury Brands had actual orders from Shoppers. (N.T. 2/4/14, pp. 7, 37)

E.    **Mr. Pettinato Presented a Confidentiality Agreement Which Power Line Revised**

53.    On February 10, 2009, Mr. Pettinato forwarded a document labeled "Confidentiality Agreement" to Mr. Parker. (N.T. 2/3/14, pp. 43-44; N.T. 2/4/14, pp. 7-8; Exhibit P-1)

54.    The "Disclosing Party" listed on the Confidentiality Agreement was "Solebury Brands, LLC." (N.T. 2/4/14, p. 10, 58; Exhibits P-1 and P-2)

55.    The initial version of the Confidentiality Agreement stated, "Disclosing Party intends to disclose to Recipient certain information ("Confidential Information") regarding a possible business transaction or investment by Recipient ... " (N.T. 2/4/14, p. 56; Exhibit P-1)

56.    Power Line did not consider this business transaction between Power Line and Defendants to be a "joint venture" or an investment by Power Line in Defendants' company. (N.T. 2/3/14, pp. 44, 123; N.T. 2/4/14, p. 36)

57.    Power Line therefore revised the Confidentiality Agreement to delete any references to an investment or a joint partnership. (N.T. 2/3/14, pp. 41-47; N.T. 2/4/14, pp. 8-9; Exhibit P-5)

58.    The revised Confidentiality Agreement instead stated, "Disclosing Party intends to disclose to Recipient certain information ("Confidential Information") for the purpose of considering a business relationship." (Exhibit P-2)

59.    Mr. Pettinato said that he was "good with [the] changes" that Power Line had made to the Confidentiality Agreement. (N.T. 2/4/14, pp. 8-9, 56-57; Exhibit P-5)

180             BUCKS COUNTY LAW REPORTER

2016 BCBA       **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

60.     Mr. Pettinato believed that Mr. Parker appropriately modified the Confidentiality Agreement to reflect a vendor relationship between Power Line and Defendants, and not an investment relationship. (N.T. 2/4/14, pp. 58, 115-116)

## F. The Objective of Hermes Calgon/THG Acquisition, LLC Changed after it Failed to Win its Initial Objective

61.     Hermes Calgon/THG Acquisition, LLC was ultimately unsuccessful in winning the bid for the Calgon and The Healing Garden product brands. (N.T. 2/4/14, p. 67)

62.     The opportunity for Hermes Calgon/THG Acquisition, LLC to acquire the Calgon and The Healing Garden product brands was lost in December of 2008. (N.T. 9/4/14, p. 112)

63.     Mr. Falsetti testified that after the opportunity to acquire Calgon and The Healing Garden failed, the company "morphed into a business that had potential to chase other—when I say chase, pursue other acquisitions, perhaps, or this particular venture." (N.T. 2/4/14, p. 223)

64.     The objective of Hermes Calgon/THG Acquisition, LLC to pursue other opportunities was never memorialized in writing or recorded anywhere in the company records. (N.T. 2/4/14, p. 223)

## G. Defendants Provided "Official Company Info" to Power Line

65.     On March 18, 2009, Mr. Pettinato sent an email to Mr. Parker with the subject line "Official company info." (N.T. 2/4/14, p. 21; Exhibit P-3)

66.     Mr. Parker gave this "Official company info" email to Ms. Johanningsmeier. (N.T. 2/4/14, p. 21)

67.     Mr. Pettinato intended that Ms. Johanningsmeier read, understand and believe the "Official company info" email. (N.T. 2/4/14, p. 145-148)

68.     Although Ms. Barry saw this email, she did nothing to correct any of the information contained in the document. (N.T. 9/4/14, p. 7)

69.     In the email of March 18, 2009 sent to Mr. Parker and copied to Ms. Barry, Mr. Pettinato represented the "Official company info" of the company that he was working on behalf of to be the following:

Legal Name: Hermes, LLC

D/B/A as Name: Solebury Brands LLC

Address: P.O.Box 499

City: Solebury           State: PA          Zip Code: 18963

Federal ID#: 26-3671142

Telephone: (610) 608-0606

Fax: (888) 716-0750

Business Type: Corporation   X   Partnership \_\_\_\_\_   Sole Ownership \_\_\_\_\_

Other \_\_\_\_\_ (Exhibit P-3)

70.     Mr. Pettinato testified that there was no entity named "Hermes, LLC" and that the "Official company info" email incorrectly listed the legal name of the company as "Hermes, LLC." (N.T. 2/4/14, p. 143)

71. Mr. Pettinato testified that Defendants used both "Solebury Brands" and "Solebury Brands, LLC" as fictitious names of Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 92-93)

72. The federal EIN listed on the "Official company info" email is not the EIN for Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, p. 144)

73. The "business type" of Hermes Calgon/THG Acquisition, LLC, listed in the "Official company info" email was inaccurate because the company was not a corporation; rather it was a limited liability company. (N.T. 2/4/14, p. 146)

## H. Defendants Sent a PowerPoint Presentation to Power Line

74. On March 18, 2009, Mr. Pettinato sent a PowerPoint presentation containing a "Confidential Investor Presentation" overview of SoleburyBrands" to Mr. Parker at the request of Ms. Johanningsmeier. (N.T. 2/4/14, p. 20, 148; Exhibit P-4)

75. Mr. Parker gave the PowerPoint presentation to Ms. Johanningsmeier. (N.T. 2/4/14, p. 21)

76. Mr. Pettinato testified that he sent the PowerPoint presentation to Mr. Parker because Ms. Johanningsmeier had asked for information on his company because "she wanted some understanding of our future vision and our strategy" and "would like to know more about what you guys are doing." (N.T. 2/4/14, pp. 141-142)

77. The PowerPoint presentation was dated "February 2009." (N.T. 2/4/14, p. 150; Exhibit P-4)

78. Mr. Falsetti drafted the PowerPoint presentation around the time that it was sent. (N.T. 2/4/14, pp. 149-150)

79. Mr. Falsetti testified that he "didn't pay all that much attention" to the PowerPoint presentation when he prepared it and stated that "there's nothing unusual about it." (N.T. 2/4/14, p. 264)

80. Mr. Pettinato reviewed the PowerPoint presentation before it was sent to Mr. Parker and did not make any revisions to it. (N.T. 2/4/14, p. 151)

81. The name Hermes Calgon/THG Acquisition, LLC does not appear anywhere on the PowerPoint presentation. (N.T. 2/4/14, pp. 151-152; Exhibit P-4)

82. The names Hermes, LLC; Solebury Brands, LLC; Dana Holdings LLC; Hermes, LLC D/B/A Solebury Brands LLC; Solebury Brands; and SoleburyBrands appear in various places in the PowerPoint presentation. (Exhibit P-4)

83. Ms. Johanningsmeier reviewed the PowerPoint presentation carefully because she was "looking for reassurance that [Defendants] had money that they could pay." (N.T. 2/3/14, p. 54)

84. Ms. Johanningsmeier was not concerned by the "Disclaimer" contained in the PowerPoint presentation because Mr. Pettinato "knew we weren't investing in his company" and "I felt this packet was to show me who was behind the company and what they were doing." (N.T. 2/3/14, p. 57)

85.     No one informed Ms. Johanningsmeier that there might be inaccurate information in the PowerPoint presentation. (N.T. 2/3/14, p. 57)

**(i)     Defendants' Misrepresentations Regarding Walgreens**

86.     The PowerPoint presentation stated that "The Company's U.S. based success is in partnership with America's largest drug sector retailer Walgreens with excess of 6,000 stores across the country." (N.T. 2/3/14, p. 58; Exhibit P-4)

87.     After reading the PowerPoint presentation, Ms. Johanningsmeier believed that Defendants had a partnership with Walgreens. (N.T. 2/3/14, p. 58)

88.     Despite the aforesaid representation in the PowerPoint presentation, Solebury Brands had not had any previous successes, and did not have a partnership with Walgreens. (N.T. 2/4/14, pp. 154-155)

89.     The PowerPoint presentation stated that the partnership with Walgreens "represent[ed] the 'second leg' of growth and [was] schedule[d] to hit stores in August of this year." (N.T. 2/4/14, p. 155; Exhibit P-4)

90.     There was no actual schedule for the product line to be introduced in Walgreens in August 2009. (N.T. 2/4/14, pp. 154-155, 262; Exhibit P-4)

**(ii)     Defendants' Misrepresentations Regarding Shoppers**

91.     The PowerPoint presentation stated that "Shoppers Drug Mart first shipment is June of 2009..." (Exhibit P-4)

92.     Defendants never received any actual orders from Shoppers Drug Mart. (N.T. 9/4/14, pp. 14, 130)

93.     Hermes Calgon/THG Acquisition, LLC never entered into a written contract with Shoppers Drug Mart. (N.T. 2/4/14, p. 213; N.T. 9/4/14, p. 14)

**(iii)     Defendants' PowerPoint Presentation Stated "No Further Capital Needs"**

94.     The PowerPoint presentation stated that "we anticipate no further capital needs beyond this funding, as we are immediately profitable." (Exhibit P-4)

95.     As a result of the PowerPoint presentation, Ms. Johanningsmeier believed that Defendants "had billed enough profit into the project in order to be profitable" and "that there was money to pay [Power Line]." (N.T. 2/3/14, p. 62)

**(iv)     Defendants Asserted that their PowerPoint Presentation was Nothing More than an "Aspirational Document"**

96.     Mr. Pettinato and Mr. Falsetti testified that the PowerPoint was "an aspirational document," an "aspirational strategy of future state" and "a vision of the plan of the company in the future, our vision of growth." (N.T. 2/4/14, pp. 156-157, 195-196, 258)

97.     The PowerPoint presentation does not state that it is "an aspirational document." (Exhibit P-4)

**(v)     Ms. Johanningsmeier Relied on the PowerPoint Presentation and "Official Company Info" Email to Conduct Business With Defendants**

98.     The PowerPoint presentation lists "Dana Holdings LLC" at the bottom left hand corner of every page. (N.T. 2/4/14, p.153; Exhibit P-4)

99. After reviewing the PowerPoint presentation, Ms. Johanningsmeier researched Dana Holdings, LLC and learned that it was an investment company owned by Mr. Falsetti. (N.T. 2/3/14, p. 65)

100. Ms. Johanningsmeier researched "Hermes, LLC," which was the name on the "Official company info" email, and learned that it was an investment company that had assets of $17 million. (N.T. 2/4/14, p. 65)

101. After reviewing the documents provided by Defendants and performing her own due diligence, Ms. Johanningsmeier was satisfied that Defendants had the funds and finances to pay for the Product Line. (N.T. 2/3/14. pp. 61-66, 111-112)

**I. Defendants Never Used the Name Hermes Calgon/THG Acquisition, LLC**

102. Defendants did not refer to Hermes Calgon/THG Acquisition, LLC in the PowerPoint presentation, in the Confidentiality Agreement, or in any other correspondence. (Exhibits P-1 to P-7; N.T. 2/3/14, p. 179)

103. Although Defendants used the names Hermes, LLC; Solebury Brands, LLC; Dana Holdings LLC; Hermes, LLC D/B/Λ Solebury Brands LLC; Solebury Brands; and SoleburyBrands at various times in their presentations to and communications with Power Line, Defendants never referred to their company as Hermes Calgon/THG Acquisition, LLC.

104. Mr. Falsetti testified that he was unaware of any documentation that contained both the Product Line name and the Hermes Calgon/THG Acquisition, LLC name. (N.T. 2/4/14, pp. 252-253)

**J. Power Line Purchased Material for the Product Line Based Upon Representations From Mr. Pettinato**

105. On March 8, 2009, Mr. Pettinato sent an email to Mr. Parker that stated in part, "Thanks for meeting again last week. It's rock and roll time." (N.T. 2/4/14, p. 16; Exhibit P-21)

106. Mr. Pettinato testified that the email was meant to indicate to Mr. Parker that Power Line needed to move onto the next step. (N.T. 2/4/14, p. 121)

107. Mr. Parker understood this email to mean that "the order was coming due, and it was time to move quickly on it." (N.T. 2/4/14, p. 16)

108. As a result, on or about March 9, 2009, Power Line ordered bottles and tubes for the Product Line because they were custom products which were made to order, and had a lead time of four to six weeks. ( N.T. 2/4/14, p. 18)

109. Power Line also ordered labels for the tubes, boxes, sprayers and "[a]lmost everything needed to start this job." (N.T. 2/4/14, p. 36)

110. Mr. Parker and Ms. Johanninsmeier had been assured by Mr. Pettinato prior to placing the orders that he would pay Power Line for the materials. (N.T. 2/3/14, pp. 108-109; N.T. 2/4/14, p. 36)

111. Power Line placed the orders for materials through their vendors because Mr. Pettinato stated to Ms. Johanningsmeier that he had no credit history and Power Line could get better pricing, and he would pay Power Line. (N.T. 2/3/14, p. 109; N.T. 2/4/14, p. 163)

184                    BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

112.    After meeting with Mr. Pettinato in March of 2009, and pursuant to information contained in the PowerPoint presentation, Power Line made efforts to meet a June 2009 shipment date for the Product Line to Shoppers. (N.T. 2/3/14, pp. 60-61)

113.    Mr. Pettinato conveyed a sense of urgency to Power Line concerning a deadline to complete and ship the Product Line. (N.T. 2/4/14, pp. 13-15)

114.    Power Line understood the deadline imposed by Defendants to be "when the product had to be delivered to Shoppers." (N.T. 2/4/14, p. 14)

115.    From February, 2009 until the beginning of June, 2009, Mr. Pettinato visited Power Line "a few times a week." (N.T. 2/4/14, pp. 13, 123)

116.    Mr. Pettinato had "dozens of conversations" with Mr. Parker, Mr. Vernon and Ms. Kocis during the development of the Product Line. (N.T. 2/4/14, pp. 120-121)

### K.    Power Line Developed Product Line Formulas at Defendants' Request

117.    Defendants provided Power Line with a formula for the lotion for the Product Line, but Power Line had to create the formulas for the mist and the shower and shave gel. (N.T. 2/3/14, pp. 142, 161)

118.    Mr. Pettinato requested that Power Line develop the formulas for the Product Line mist and the shower and shave gel. (N.T. 2/4/14, p. 119)

119.    In addition to developing the formulas for the mist and the shower and shave gel, Ms. Kocis also had to reformulate the lotion formula. (N.T. 2/3/14, pp. 142, 161)

120.    In the spring of 2009, Ms. Kocis regularly spent a half day to a full day working on the Product Line formulas. (N.T. 2/3/14, p. 164)

121.    The lotion had over twenty ingredients plus fragrances; the shave and shower gel had thirteen ingredients plus fragrances; and the body mist had four ingredients plus fragrances. (N.T. 2/3/14, p. 162)

122.    Ms. Kocis had to source more than thirty ingredients from various vendors in developing the formulas, because Power Line did not have the materials on hand. (N.T. 2/3/14, pp.162-163)

123.    Mr. Pettinato had "dozens of conversations" with Ms. Kocis about the formulas during their development. (N.T. 2/4/14, at pp. 119-121)

124.    Some fragrances that were provided by Defendants to Power Line did not work well with the base and needed to be reformulated. (N.T. 2/3/14, p. 161)

125.    Power Line has charged between $7,000 and $15,000 per formula; the industry standard is $10,000 per formula. (N.T. 2/3/14, p. 35)

126.    Ms. Kocis developed eighteen different formulas for the Product Line, but Power Line only billed Defendants $30,000.  (N.T. 2/3/14, p. 92).

### L.    The Parties' Understanding of How and When Power Line Was to Be Paid

127.    Mr. Pettinato testified that the original plan was for Solebury Brands to purchase all of the packaging and labels for the Product Line. (N.T. 2/4/14, p.163)

128. Solebury Brands did not purchase the materials because Defendants did not have the credit to enable them to purchase those materials. (N.T. 2/4/14, p. 163)

129. Mr. Pettinato testified that Hermes Calgon/THG, Acquisition, LLC initially offered to make a $10,000.00 payment to Power Line for those packaging materials. (N.T. 2/4/14, p. 164)

130. Power Line declined the $10,000.00 offer and advised Defendants that they would send invoices which Defendants were to pay upon receipt. (N.T. 2/4/14, pp. 164-165)

131. Mr. Falsetti testified that he expected that Power Line was going to be paid when he stated that if "Shoppers would have initiated a purchase order[,] [w]e would have then concluded filing—filling those tubs you see in front of you and all of the people that had to be paid would have been paid including them (Power Line)." (N.T. 2/4/14, p. 227)

132. Ms. Johanningsmeier testified that she explained to Defendants that "Payment terms were to be paid in full for all raw materials or packaging components when they came due, and then the finished product would be COD." (N.T. 2/3/14, p. 70)

133. Ms. Johanningsmeier stated that Power Line had a verbal purchase order from Defendants because Mr. Pettinato "sat down at the table and he said he was going to pay us. He said how he was going to pay us and when he was going to pay us. I did background work and there was money." (N.T. 2/3/14, p. 108)

134. Ms. Johanningsmeier believed she had a written contract with Defendants "because they gave us exactly what they wanted in spreadsheets." (N.T. 2/3/14, p. 110)

135. Ms. Johanningsmeier testified that when she asked Mr. Pettinato how Power Line would be paid because Defendants were a new company, Mr. Pettinato stated that Power Line would be paid "when the bills are due." (N.T. 2/3/14, pp. 50, 112)

136. Ms. Johanningsmeier testified that Mr. Pettinato repeatedly stated that "I will pay you when the items are due." (N.T. 2/3/14, p. 112)

137. Ms. Johanningsmeier testified that Mr. Pettinato verbally assured her that Power Line would be paid for the thousands of components Power Line purchased for the Product Line. (N.T. 2/3/14, p. 84)

138. Mr. Vernon testified that Mr. Pettinato told him to "just let me know what I owe you and I will write you a check." (N.T. 2/4/14, pp. 36-37)

139. Mr. Parker testified that Mr. Pettinato stated to him that "whenever you get the costs of the components together, send [me] over the information, an invoice, and [I]'ll come by and pay for those then." (N.T. 2/4/14, p. 12)

140. Mr. Vernon testified that Mr. Pettinato told him on at least four occasions that Power Line would be paid. N.T. 2/4/14, pp. 44-45)

141. Ms. Johanningsmeier testified that in June, 2009, Mr. Pettinato requested that the invoices be sent to him, and specifically said, "Send me the invoices." (N.T. 2/3/14, p. 82)

186        BUCKS COUNTY LAW REPORTER

2016 BCBA      **Power Line v. Hermes Calgon/THG**     [89 Bucks Co. L. Rep.

142.    On June 30, 2009, Power Line sent the invoices to Mr. Pettinato by email and by regular mail to the address which was listed on the Product Line labels and on the business cards supplied to Ms. Johanningsmeier by Mr. Pettinato and Ms. Barry. (N.T. 2/3/14, pp. 83-84; Exhibits P-7 & P-13)

143.    The address to which the invoices were sent was "Solebury Brands, P.O. Box 499, Solebury, PA 18963. (Exhibits P-7 & P-13)

144.    The invoices that were sent by regular mail to the Solebury post office box address were returned because the post office box was closed. (N.T. 2/3/14, pp. 84-85; Exhibit P-13)

145.    On July 16, 2009, Mr. Pettinato sent an email to Mr. Vernon and Mr. Parker that said, "could you please fax me the invoices..." (See Finding of Fact #187; Exhibit P-11)

146.    On July 17, 2009, Mr. Pettinato sent an email to Ms. Kocis that said, "Is there any way I can get the invoices for tubes today." (Exhibit P-11)

147.    Mr. Vernon testified that he was never advised by Mr. Pettinato that only a company called Hermes Calgon/THG Acquisition LLC would pay Power Line and that if that company had no money, Power Line would not get paid. (N.T. 2/4/14, p. 42)

148.    Mr. Parker testified that he never had a discussion with Mr. Pettinato that Power Line would be paid sixty to ninety days or more after the finished product was shipped, and he testified that Power Line would not have agreed to those terms. (N.T. 2/4/14, p. 22)

**M.    Payment to Power Line by Defendants Was Not Contingent Upon Payment to Defendants by Shoppers**

149.    Mr. Falsetti testified that Defendants obtained invoices from Power Line which they attempted "to forward up to Shoppers and say, you really should pay for this first run of goods since you elected not to take the product." (N.T. 9/4/14, p. 134)

150.    Mr. Pettinato testified that he never considered what would happen and how Power Line would be paid if Shoppers decided not to sell the Product Line in its stores. (N.T. 2/4/14, pp. 207-208)

151.    Mr. Pettinato never advised Power Line that if the alleged deal with Shoppers fell through, Power Line would lose money after purchasing 200,000 component parts. (N.T. 2/4/14, p. 208)

152.    Ms. Johanningsmeier testified that there were never any communications from Defendants to Power Line indicating that payment to Power Line was contingent upon the placement of purchase orders with Defendants by Shoppers, or upon Defendants' receipt of payments from Shoppers. (N.T. 2/3/14, pp. 88-90)

153.    Ms. Johanningsmeier testified that she did not know that the Product Line was developed exclusively for Shoppers.

154.    Mr. Parker testified that he was never advised by Mr. Pettinato that Defendants' payment to Power Line was contingent upon Defendants receiving payment from Shoppers. (N.T. 2/4/14, p. 22)

155.   Mr. Vernon testified that Mr. Pettinato never stated to him that Defendants' payment to Power Line was contingent upon Defendants receiving payment from Shoppers. (N.T. 2/4/14, p. 45)

156.   Defendants never paid Power Line for any of the expenditures associated with the Product Line. (N.T. 2/3/14, p. 86)

### N.   Power Line Was Not Aware That Shoppers Advised Defendants That They Need to Review Their Product Pricing and Strategy

157.   On March 18, 2009, Sandi Santucci ("Ms. Santucci"), the buyer for Shoppers, sent an email to Ms. Barry which stated the following:

"Hi Laura—I have concerns about your pricing.

From our initial meeting your platform was to go after the Calgon/HG brand with lower retails and increased value proposition.

The initial retails you have proposed ranged from $2.99-5.99 for the core skus. Your pricing now reflects higher retails than Calgon.

I think you need to review who and where you want to be. In this market you need to consider the brand positioning and go in at an attractive price points to gain customers.

You have premium pricing with no brand recognition. I need you to review the strategy—you need to be at least $2.00 cheaper than Calgon to really break into the market since the brand is not established.

Please come back to me with new pricing—my margins cannot be lower than 42% in this category—my current exclusives range at 45% and higher.

Sandy"

(N.T. 9/4/14, pp. 17-18; Exhibit P-36)

158.   Ms. Barry did not recall discussing Ms. Santucci's email with Power Line. (N.T. 9/4/14, p. 18)

159.   Ms. Barry had five or six meetings in Canada with Shoppers. (N.T. 9/4/14, p. 56)

160.   No one from Power Line accompanied Ms. Barry to any of her meetings with Shoppers. (N.T. 9/4/14, p. 56)

161.   Ms. Barry had "ten to fifteen" phone calls relating to the Product Line with Shoppers. (N.T. 9/4/14, p. 56)

162.   No one from Power Line participated in the phone calls that Ms. Barry had with Shoppers. (N.T. 9/4/14, p. 57)

163.   Ms. Barry exchanged "dozens" of emails with Ms. Santucci or others at Shoppers regarding the Product Line. (N.T. 9/4/14, p. 57)

164.   No one from Power Line was copied on any of those emails. (N.T. 9/4/14, p. 57)

165.   Mr. Pettinato never advised Power Line that Ms. Santucci of Shoppers had indicated to Defendants in her March 18, 2009 email that they needed to review their strategy and revise their pricing. (N.T. 2/4/14, p. 133)

188                    BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

166.    Mr. Pettinato did not forward any emails received from Shoppers to anyone at Power Line. (N.T. 2/4/14, p. 133)

167.    Information provided to Power Line concerning Shoppers came from Mr. Pettinato and not directly from Shoppers. (N.T. 2/4/14, p. 75)

168.    Defendants did not forward any emails from anyone at Shoppers to Ms. Johanningsmeier. (N.T. 2/3/14, p. 151)

**O.    Defendants' Representations to Power Line Despite Absence of Any Agreement Between Shoppers and Defendants**

169.    Despite the March 18, 2009 email from Ms. Santucci regarding the need for Defendants to review their pricing and product line strategy, Mr. Pettinato testified that he still believed that they had the "go-ahead" from Shoppers and that the Product Line would ship in July. (N.T. 2/4/14, pp. 130-131)

170.    On March 18, 2009 Mr. Pettinato sent an email to Mr. Parker, with a copy to Ms. Barry, which stated in part, "We need to place orders to Tube guy ASAP to hit dates." (N.T. 2/4/14, p. 20; Exhibit P-21)

171.    As a result of that email, Mr. Parker believed that Mr. Pettinato "had a specific date in mind, and backing the order into that we needed to get the order done immediately." (N.T. 2/4/14, p. 20)

172.    Ms. Barry agreed that when she met with Ms. Santucci in May, 2009, Ms. Santucci told her that they were unable to move forward. (N.T. 9/4/14, p. 29)

173.    On June 4, 2009, Ms. Santucci sent an email to Mr. Pettinato that stated in part, "Hi Frank—when Laura and I met last month I updated her that we are currently reviewing the whole bath category and that decisions regarding space have not yet been confirmed. We have not confirmed that we are able to move forward as of yet." (Exhibit P-32)

174.    Ms. Barry confirmed that as of June, 2009, Ms. Santucci still had not provided approval to move forward. (N.T. 9/4/14, p. 29)

175.    Ms. Santucci sent an email to Mr. Falsetti and Mr. Pettinato on June 5, 2009, which stated in part "I have not confirmed a green light to go ahead or timing at this point. Internally there are still discussions over space and location for exclusive brands. In my meeting with Laura I did express this was tentative and would advise back firm timelines and next steps." (Exhibit P-32)

176.    Although Ms. Barry testified that "we did have agreements with Shoppers Drugs in Canada," she admitted that "we never got the contract" with Shoppers. (N.T. 9/4/14, p. 14)

177.    Mr. Falsetti testified that "We never received any orders from Shoppers." (N.T. 9/4/14, p. 130)

**P.    Despite the Absence of Any Agreement Between Shoppers and Defendants, Power Line Continued to Purchase Material for Product Line**

178.    Power Line had no communications with anyone at Shoppers. (N.T. 2/3/14, p. 90)

179.    As a general practice, Power Line does not have any communication with any of its clients' customers. (N.T. 2/3/14, p. 91)

180.    Mr. Pettinato was aware, after discussions with Mr. Parker and Mr. Vernon, that Power Line was purchasing thousands of "long lead item" component parts including tubes, sprayer, and corrugated material. (N.T. 2/4/14, pp. 138-139)

181.    Power Line purchased 65,000 tubes, 63,000 sprayers, 41,000 unit cartons and 131,000 labels. (N.T. 2/3/14, pp. 74-75)

182.    The components that Power Line purchased encompassed 38 pallets, each six feet high. (N.T. 2/3/14, pp. 75-76)

## Q.    The Tubes Containing Labels with Incorrect Information Could Not Be Reused

183.    The tubes had labels affixed to them that stated "My Escape!" on the front and "Distributed in the United States by Solebury Brands, LLC" on the back. (N.T. 2/3/14, pp. 71-72, 76; Exhibit P-9)

184.    The labels designed by Defendants stated "Solebury Brands, LLC" and not "Hermes Calgon/THG Acquisition, LLC." (Exhibit P-9)

185.    Mr. Falsetti characterized the statement on the labels that the Product Line was "Distributed in the United States by Solebury Brands, LLC" as a "typo" and an "oversight." (N.T. 2/4/14, p. 248)

186.    The labels that were affixed to the tubes cannot be removed and the tubes cannot be reused. (N.T. 2/3/14, p. 77)

187.    Mr. Pettinato sent an email on July 16, 2009 to Mr. Parker and Mr. Vernon stating in part, "The deal with Shoppers continues to be delayed, could you please fax me the invoices, and your estimate of how many pallets, I'm making arrangement with a warehouse local to you to store the material." (Exhibit P-11)

188.    Defendants did not make arrangements for storage. Power Line has been paying $138.70 per month to store the packaging at a facility since June 2009. (N.T. 2/3/14, pp. 93-95)

189.    If Power Line has to dispose of the stored materials because they are not reusable, it will cost between $500.00 and $2,000.00. (N.T. 2/3/14, pp. 95-96)

## R.    Defendants were Placed on Notice in June, 2009 that Shoppers Would Not Proceed With Purchase of Product Line

190.    On June 4, 2009, Mr. Pettinato sent an email to Ms. Santucci which stated in part, "As you may expect we are in the process of our initial production run and fully expect to have all SKU's completed and ready to ship per your revised schedule ..." (Exhibit P-32)

191.    On June 5, 2009, Ms. Santucci sent the reply email to Mr. Pettinato which stated in part, "We have not confirmed that we are able to move forward as of yet." (Exhibit P-32)

192.    Mr. Falsetti sent an email approximately 45 minutes later in response to Ms. Santucci's email, in which he stated in part, "We are in production for an end

190 BUCKS COUNTY LAW REPORTER

2016 BCBA **Power Line v. Hermes Calgon/THG** [89 Bucks Co. L. Rep.

of July ship... These items are specific and unique to [S]hoppers exclusive and will not be usable by us in Walgreens and Ulta programs in US as you know." (Exhibit P-32)

193. Ms. Santucci sent an email later that day, in response to Mr. Falsetti's email, in which she stated in part, "I have not confirmed a green light or go ahead or timing at this point. ... In my meeting with Laura I did express this was tentative and would advise back firm timelines and next steps." (Exhibit P-32)

194. Mr. Falsetti responded to Ms. Santucci later that evening with an email that stated in part, "Sandy, given our manufacturing commitments and current production of good for end July ship ...... this will kill the company. The goods are unique to the exclusive and paid for by us." (Exhibit P-32)

### S. Withdrawals and Distribution of Company Assets, and Payment of Expenses

195. Mr. Falsetti was issued checks from the company bank account for $15,000 on March 20, 2009; $30,000 on April 3, 2009; $15,000 on April 20, 2009; $15,000 on April 28, 2009; $25,000 on June 2, 2009; $8,000 on June 6, 2009; $25,000 on June 17, 2009; and $25,000 on June 26, 2009. (Exhibit P-26)

196. The Hermes Calgon/THG Acquisition, LLC Wachovia Bank Custom Business Checking Account #2000038446634 statements reflect funds transfers to Mr. Falsetti of $50,000 on December 12, 2008; $30,000 on January 5, 2009; $35,072.91 on January 30, 2009; $10,000 on February 17, 2009; and $15,000 on March 23, 2009. (Exhibit P-26)

197. On June 2, 2009, the balance in the Wachovia Business Checking Account was $152,362.85. (N.T. 2/4/14, p. 289; Exhibit P-40)

198. As of July 16, 2009, the balance in the checking account was $1,534.77. (N.T. 2/4/14, pp. 289-290; Exhibit P-40)

199. In the period between June 5, 2009 and July 16, 2009, the company checking account statement reflects the following withdrawals:

| | | |
|---|---|---|
| 6/5/09 | Joseph Falsetti | $25,000.00 |
| 6/5/09 | Frank Pettinato | $10,000.00 |
| 6/8/09 | Laura Barry | $ 5,699.00 |
| 6/8/09 | Brian Bradley | $37,500.00 |
| 6/19/09 | Joseph Falsetti | $25,000.00 |
| 6/29/09 | Joseph Falsetti | $25,000.00 |
| 7/2/09 | SDB Technology (Simon Brown) | $ 2,978.73 |
| 7/7/09 | Laura Barry | $ 4,000.00 |
| 7/7/09 | Joseph Falsetti | $ 8,000.00 |
| 7/16/09 | Aetna | $ 5,754.20 |

(N.T. 2/4/14, pp. 289-290; Exhibit P-26, P-40, Exhibit D)

200. Mr. Falsetti was unable to provide an explanation for the apparent accelerated withdrawals from the checking account which coincided with the

time frames when the bid to purchase Calgon and The Healing Garden from the Ascendia bankruptcy failed, and when Shoppers indicated that it had not committed to purchasing the Product Line. (N.T. 9/4/14, pp. 143-144)

201.   Mr. Falsetti in his capacity as CEO was either unable or unwilling to provide an explanation for certain checks that were issued against the checking account, including a check to SDB Technology for $2,978.73. (N.T. 9/4/14, pp. 143-145, 147)

202.   Mr. Falsetti testified that the check issued to Laura Barry for $5,699.00 was "probably" to repay her expenses. (N.T. 9/4/14, pp. 145-146)

203.   Mr. Falsetti testified that the check issued to Joseph Sacco for $160.20 was to repay his expense for the telephone bill. (N.T. 9/4/14, p. 146)

204.   Mr. Falsetti acknowledged that the payment to Aetna for $5,754.20 "was a company obligation to Aetna for [his] health insurance." (N.T. 9/4/14, p. 146)

205.   Sharon Ingarra is a graphic artist and former co-worker of Mr. Pettinato who provided trademarking, graphic design and artwork for Defendants. (N.T. 2/4/14, pp. 182-183)

206.   Ms. Ingarra, whom Mr. Pettinato considered a vendor of Solebury Brands, was reimbursed for her expenses by Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 183-185)

207.   Mr. Pettinato, Ms. Barry and member Simon Brown were reimbursed for their expenses. (Exhibit P-26; N.T. 9/4/14, p. 32)

208.   Ms. Barry received a check for $1,151.32 dated March 17, 2009 which stated that it was for "Expenses." (Exhibit P-26)

209.   Ms. Barry received a check for $5,000 dated April 4, 2009. (Exhibit P-26)

210.   Ms. Barry received a check for $851.49 dated April 27, 2009. (Exhibit P-26)

211.   Ms. Barry received a check for $5,000 dated May 2, 2009. (Exhibit P-26)

212.   Ms. Barry testified that the $5,000 check was "probably" for reimbursement of earlier expenses. (N.T. 9/4/14, pp. 35-36)

213.   Mr. Pettinato received a check dated June 2, 2009 for $10,000. (exhibit P-26)

214.   Mr. Pettinato testified that the check for $10,000 was for expenses and was not a return of capital. (N.T. 2/4/14, pp. 180-181)

215.   Mr. Falsetti testified that "the company had an obligation to Verizon to pay the expenses associated with [Mr. Falsetti's] phone bill. (N.T. 9/4/14, p. 146)

216.   Mr. Falsetti testified that the company had an obligation to pay expenses related to his health insurance. (N.T. 9/4/14, p. 146)

**T.   Acquisition and Subsequent Disbursement of the Company's "Capital;" the Mother-in-Law Loan**

217.   In explaining the funding of Hermes Calgon/THG Acquisition, LLC, Mr. Falsetti testified that "there was capital that was collected in the sum of about

192        BUCKS COUNTY LAW REPORTER

2016 BCBA      **Power Line v. Hermes Calgon/THG**    [89 Bucks Co. L. Rep.

$750,000 to acquire through bankruptcy process the assets of Calgon and Healing Garden." (N.T. 9/4/14, p. 107)

218.    Mr. Falsetti testified that after the "Calgon deal fell apart ... the majority of the investors outside of myself withdrew all of their capital." (N.T. 9/4/14, p. 111)

219.    Mr. Falsetti testified that he left money in the Hermes Calgon/THG Acquisition, LLC bank account because "I had lost about $175,000 in that process of the $350,000 that was placed in there, so we thought that if we were going to pursue additional business, we'd use those dollars." (N.T. 9/4/14, p. 114)

220.    Mr. Falsetti testified that "the source of that $350,000 that [he] put into the company" was his mother-in-law. (N.T. 9/4/14, p. 114)

221.    In response to Interrogatory No. 1 of Plaintiff's Interrogatories—Third Set, which requested the identity of all loans to Hermes Calgon/THG Acquisition, LLC, Defendants indicated that Ellen Sides, Mr. Falsetti's mother-in-law, loaned $350,000.00 in 2008 to "Joseph Falsetti/RSB, LLC/Hermes Calgon/THG Acquisition, LLC." Terms of the loan were upon demand with interest at 7.4% and annual interest-only payments of $26,000.00. (Exhibit P-41)

222.    Mr. Falsetti testified that "the business that was funded" had the obligation to repay his mother-in-law. (N.T. 2/4/14, p. 237)

223.    When questioned if "the business that was funded" was RSB, LLC, Mr. Falsetti replied, "If that's the funding entity I guess ultimately it would roll through to Solebury Brands." (N.T. 2/4/14, p. 237)

224.    Mr. Falsetti testified that there was no documentation to support his testimony on his mother-in-law's $350,000 investment. (N.T. 2/4/14, p. 238)

225.    There is no documentation or evidence to support Mr. Falsetti claim that Ms. Sides "provided capital" to Hermes Calgon/THG Acquisition, LLC, and there is no evidence in the books and records of Hermes Calgon/THG Acquisition, LLC that any such capital was provided to the company. (N.T. 9/4/14, pp. 113-121; Exhibit P-25)

226.    There is no written documentation setting forth the terms of Ms. Sides' investment or any other repayment obligations. (N.T. 2/4/14, pp. 234-238)

227.    Mr. Falsetti testified that "The reason it wasn't documented was cause [sic] I knew it would change again, that that investment would move away from that LLC to another entity because I knew it looked at that time like there was not going to be any business within it." (N.T. 2/4/14, p. 238)

228.    Mr. Falsetti testified that "The intent originally was to take the $750,000 and convert that to a preferred that would pay 8 percent. When everyone else took their money out, I left it in for her paying the same interest rate." (N.T. 2/4/14, p. 238)

229.    The interest rate of eight percent payable to Ms. Sides was not documented anywhere. (N.T. 2/4/14, p. 238)

230.    The Wachovia Bank Custom Business Checking Account statements for Hermes Calgon/THG Acquisition, LLC reflect that deposits of $7,000 each were made on August 12, 2009 and November 23, 2009. (Exhibits P-26 & P-40)

231.    The Wachovia Bank Custom Business Checking Account statements for Hermes Calgon/THG Acquisition, LLC reflect that four (4) funds transfers of $7,000 each, totaling $28,000, were sent to Bank of America/Merrill Lynch "for further credit to Ms. Sides" on February 14, 2009, May 14, 2009, August 19, 2009 and November 30, 2009. (N.T. 9/4/14, pp. 5, 64, 148-149; Exhibits P-26 & P-40)

232.    Mr. Falsetti agreed that the $7,000 deposits made in August and November of 2009 to the Hermes Calgon/THG Acquisition, LLC bank account were for the purpose of funding payments to Ms. Sides. (N.T. 9/4/14, pp. 148-149)

233.    Mr. Falsetti testified that he "never viewed Power Line as an obligation." (N.T. 9/4/14, p. 149)

234.    Mr. Falsetti testified that he "absolutely" viewed his mother-in-law as a company obligation. (N.T. 9/4/14, pp. 149-150)

235.    Mr. Falsetti testified that he "bought the obligation" to pay back the "capital" that Ms. Sides' had provided from Hermes Calgon/THG Acquisition, LLC. (N.T. 2/4/14, pp. 240-242)

236.    Mr. Falsetti testified that Dana Holdings, LLC is an "LLC that he controls," and it now owns the obligation. (N.T. 2/4/14, p. 241)

237.    Mr. Falsetti testified that Dana Holdings, LLC "assumed" the obligation to repay the "capital" that Ms. Sides provided "from a failed business" which was Solebury Brands. (N.T. 2/4/14, pp. 241-242)

238.    Mr. Falsetti testified that Hermes Calgon/THG Acquisition, LLC was making interest payments to Ms. Sides "because initially it was an obligation, it was going to be a note on the company." (N.T. 9/4/14, p. 141)

239.    Mr. Falsetti testified that he did not know if he withdrew $263,072.01 from the company. (N.T. 9/4/14, pp. 141-142)

240.    Mr. Falsetti was unable to explain how he "lost" $175,000 of his own money when Ms. Sides had provided $350,000 and he received $263,072.91 in distributions from the company bank account. (N.T. 9/4/14, p. 142)

**U.    Defendants Did Not Abide By the Company Operating Agreement**

241.    When questioned about the Operating Agreement for Hermes Calgon/ THG Acquisition, LLC, and the necessity for "formal" operations, Mr. Pettinato testified that "there's discretion and limited expectations of formality." (N.T. 2/4/14, pp. 198-201)

242.    Mr. Pettinato testified that traditional formalities were relaxed because "we were working in haste" which "caused some inaccuracies." (N.T. 2/4/14, p. 192)

243.    Ms. Falsetti and Ms. Massad, who were directors of Hermes Calgon/ THG Acquisition, LLC, had no apparent involvement with the company operations. (N.T. 2/4/14, pp. 82-84)

244.    Hermes Calgon/THG Acquisition, LLC never had any Directors Meetings and Mr. Pettinato never had any discussions with the other directors, Ms. Falsetti and Ms. Massad, about company business. (N.T. 2/4/14, pp. 83-64)

194 BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

245. Even though Mr. Falsetti was not a member, director or unit holder of Hermes Calgon/THG Acquisition, LLC, Mr. Pettinato considered Mr. Falsetti to be the principal person in charge of the company. (N.T. 2/4/14, p. 84)

246. Mr. Pettinato testified that Mr. Falsetti had control over the finances of the company. (N.T. 2/4/14, p. 84)

247. Mr. Falsetti testified that as CEO of Hermes Calgon/THG Acquisition, LLC he was responsible for the finances of the company. (N.T. 2/4/14, p. 266)

## V. The Company Tax Return Was Inaccurate

248. Mr. Falsetti testified that it was his responsibility to ensure that the tax return was accurate. (N.T. 2/4/14, p. 267)

249. When questioned about the tax preparation for Hermes Calgon/THG Acquisition, LLC, Mr. Falsetti testified that he "wasn't really paying attention" to the company in the Spring of 2009 because he was "pursuing different business opportunities ... through this vehicle (Hermes Calgon/THG Acquisition, LLC) if something materialized because it was already formed." (N.T. 2/4/14, pp. 267-269)

250. Mr. Falsetti testified that he did not know if a tax return for the company was filed in 2008 because "there was no business there" and he "wasn't paying attention to it." (N.T. 2/4/14, pp. 267-268)

251. Mr. Falsetti received a Schedule K-1 from Hermes Calgon/THG Acquisition, LLC in 2009 that stated that he was the "General Partner or LLC Managing Member." (Exhibit P-25; N.T. 2/4/14, pp. 270-271)

252. Schedules B-1 and K-1 for the 2009 tax return for Hermes Calgon/THG, LLC stated that Mr. Falsetti owned 100% of the capital of the company. (N.T. 2/4/14, p. 271; Exhibit P-25)

253. Schedule K-1 of the 2009 tax return reported $185,354 of distributions to Mr. Falsetti. (Exhibit P-25)

254. The Wachovia Bank Business Checking Account statements for Hermes Calgon/THG Acquisition, LLC, revealed that funds transfers and checks totaling $263,072.91 were issued to Mr. Falsetti during the period from January 5, 2009 to July 7, 2009. (Exhibit P-26; Exhibit P-40; Videotape Fascia Deposition 8/29/14, p. 31)

## W. Defendants Admit the Company Was Not Properly Capitalized

255. Mr. Falsetti testified that "there was no capitalization of the company." (N.T. 9/4/14, p. 120)

256. Mr. Falsetti testified that there were "no capitalization needs of the company" when he withdrew $35,072.91 on January 12, 2009, $10,000 on February 17, 2009 and $15,000 on February 27, 2009 because "there was no business." (N.T. 9/4/14, pp. 126-127)

257. Mr. Falsetti testified that Hermes Calgon/THG Acquisition, LLC "never formalized a business." (N.T. 2/4/14, p. 227)

258. Mr. Pettinato sent an email to Ms. Santucci on July 21, 2009, seeking payment from Shoppers for the "long lead items" which "are now at our contract

manufacturer, and are estimated to be worth $75-80K US." (N.T. 2/4/14, pp. 185-186; Exhibit P-33))

259.    Mr. Falsetti testified that if the business opportunity "had solidified through Shoppers and Shoppers would have initiated a purchase order" then "all of the people that had to be paid would have been paid including [Power Line]." (N.T. 2/4/14, p. 227)

260.    Ron Sacco was the Managing Partner of The Hermes Group, LLP, the accounting firm retained by Defendants. (N.T. 2/4/14, pp. 199, 209; Exhibit P-29)

261.    On March 26, 2009, Mr. Pettinato sent an email to Ron Sacco which stated, "We are making traction with Solebury Brands DBA, do we need a GST # to sell the product to shoppers drug mart in Canada, there will be no nexus in Canada, only a sale for the us business to shoppers." (Exhibit P-29)

262.    Ron Sacco sent a reply email later that same day which stated, "What the **** are you talking about? What are we selling? What do we own? I'm only a mushroom here." (Exhibit P-29)

## X.    Damages Incurred By Power Line Related to the Product Line

263.    The invoices presented by Ms. Johanningsmeier revealed that Power Line spent $62,137.21 for the materials for the Product Line. (N.T. 2/3/14, pp. 96-98; Exhibit P-10)

264.    Power Line paid all of the packaging invoices in full. (N.T. 2/3/14, pp. 97-98)

265.    Ms. Johanningsmeier testified that Power Line had charged $30,000 for the formula development and sample creations for the Product Line. (N.T. 2/3/14, pp. 92-93, 98)

266.    Ms. Johanningsmeier testified that the "formualtion fee is wrapped into the price of the final product, and since we never got to the final product, the $30,000 is due." (N.T. 2/3/14, p. 115)

267.    Ms. Johanningsmeier testified that Power Line provided Defendants with additional "design work" for the Product Line that had a value of about $2,000. (N.T. 2/3/14, pp. 96, 98)

268.    Ms. Johanningsmeier testified that Power Line had incurred over $7,000 in expenses for transportation and storage of the materials for the Product Line. (N.T. 2/3/14, pp. 93-95, 98)

269.    Power Line continued to purchase materials and develop formulas in expectation of manufacturing the Product Line, completely unaware that Shoppers had not committed to Defendants.

## III. CONCLUSIONS OF LAW

### A.    Power Line's Claim under *Quantum Meruit*

1.    It is well-established that "[c]ourts sitting in equity hold broad powers to grant relief that will result in an equitable resolution of a dispute." *Williams Twp.*

196     BUCKS COUNTY LAW REPORTER

2016 BCBA     **Power Line v. Hermes Calgon/THG**     [89 Bucks Co. L. Rep.

*Bd. of Supervisors v. Williams Twp. Emergency Co., Inc.,* 986 A.2d 914, 921 (Pa. Cmwlth. 2009).

2.     In addition, "a trial court must formulate an equitable remedy that is consistent with the relief requested; while a chancellor in equity may fashion a remedy that is narrower than the relief requested, he or she may not grant relief that exceeds the relief requested." *Id. (citing North Mountain Water Supply Co. v. Troxell,* 81 A. 157 (1911)).

3.     "A cause of action in quasi-contract for *quantum meruit,* a form of restitution, is made out where one person has been unjustly enriched at the expense of another. Therefore, a claim of *quantum meruit* raises the issue of whether a party has been unjustly enriched, and in order to prove such claim a party must successfully prove the elements of unjust enrichment." *Mitchell v. Moore,* 729 A.2d 1200, 1202 (Pa.Super. 1999) (citations omitted).

4.     "A quasi-contract imposes a duty, not as a result of any agreement, whether express or implied, but in spite of the absence of an agreement, when one party receives unjust enrichment at the expense of another." *AmeriPro Search, Inc. v. Fleming Steel Co.,* 787 A.2d 988, 991 (Pa.Super. 2001).

5.     The Superior Court of Pennsylvania has held that

> [w]here unjust enrichment is found, the law implies a quasi-contract which requires the defendant to pay to plaintiff the value of the benefit conferred. In other words, the defendant makes restitution to the plaintiff in *quantum meruit.*
> *Lackner v. Glosser,* 892 A.2d 21, 34 (Pa.Super. 2006) (quoting *AmeriPro Search, Inc. v. Fleming Steel Company,* 787 A.2d 988, 991 (Pa.Super. 2001)). "By its nature, the doctrine of quasi-contract, or unjust enrichment, is inapplicable where a written or express contract exists." *Id.*

*Northeast Fence & Iron Works, Inc. v. Murphy Quigley Co., Inc.,* 933 A.2d 664, 669 (Pa.Super. 2007).

6.     "Unjust enrichment is essentially an equitable doctrine." *Mitchell v. Moore,* 729 A.2d 1200, 1203 (Pa.Super. 1999) (*citing Styer v. Hugo,* 619 A.2d 347 (1993), *aff'd,* 637 A.2d 276 (1994)).

7.     "[T]he most significant element of the doctrine is whether the enrichment of the defendant is *unjust.* The doctrine does not apply simply because the defendant may have benefited as a result of the actions of the plaintiff." *Styer,* 619 A.2d at 350.

8.     "Where unjust enrichment is found, the law implies a contract, which requires the defendant to pay to the plaintiff the value of the benefit conferred." *Mitchell,* 729 A.2d at 1203 (*citing Schenck v. K.E. David, Ltd.,* 666 A.2d 327 (Pa. Super. 1995)).

9.    The elements necessary to prove unjust enrichment are: (1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value. (citations omitted). The application of the doctrine depends on the particular factual circumstances of the case at issue. In determining if the doctrine applies, our focus is not on the intention of the parties, but rather on whether the defendant has been unjustly enriched.

*Mitchell,* 729 A.2d at 1203-1204 (*citing Schenk,* 666 A.2d at 328)).

10.    "To sustain a claim of unjust enrichment, a claimant must show that the party against whom recovery is sought either 'wrongfully secured or passively received a benefit that it would be unconscionable for her to retain.' " *Mitchell,* 729 A.2d at 1204 (*quoting Torchia v. Torchia,* 499 A.2d 581, 582 (Pa.Super. 1985)).

11.    Here, Defendants requested and induced Power Line to develop the Product Line and purchase the requisite materials with assurances that Power Line would be paid by Defendants for their expenditures and efforts.

12.    Power Line conferred on Defendants the benefits of developing and formulating the Product Line and purchasing and storing the materials for the Product Line on behalf of Defenants, as requested by Defendants.

13.    Although Defendants repeatedly assured Power Line that they would pay for the purchase and storage of the materials and the formula development for the Product Line, Defendants failed to pay Power Line for anything.

14.    Defendants were unjustly enriched at the expense of Power Line.

## B.    Piercing the Corporate Veil—Background

15.    "The corporate form was created to allow shareholders to invest without incurring personal liability for the acts of the corporation." *Pearson v. Component Tech. Corp.,* 247 F.3d 471, 484 (3d Cir. 2001).

16.    "However, under both state and federal common law, abuse of the corporate form will allow courts to employ the "tool of equity" known as veil-piercing, i.e., disregard of the corporate entity to impose liability on the corporation's shareholders." *Pearson,* 247 F.3d at 484 (citing *Publicker Indus., Inc. v. Roman Ceramics Corp.,* 603 F.2d 1065, 1069 (3d Cir.1979)).

17.    Piercing the corporate veil is a means of assessing liability for the acts of a corporation against an equity holder in the corporation. *Vill. at Camelback Prop. Owners Assn. Inc. v. Carr,* 538 A.2d 528, 532 (Pa.Super. 1988) *aff'd sub nom. Vill. at Camelback Prop. Owners Ass'n, Inc. v. Carr,* 572 A.2d 1 (1990).

18.    "Shareholders, officers and directors are not held liable for the corporation's breach of a contract, absent an establishment of participation theory or the successful assertion of the equitable doctrine of piercing the corporate veil." *First Realvest, Inc. v. Avery Builders, Inc.,* 600 A.2d 601, 603 (Pa.Super. 1991).

198     BUCKS COUNTY LAW REPORTER

2016 BCBA     **Power Line v. Hermes Calgon/THG**     [89 Bucks Co. L. Rep.

19.    "Piercing the corporate veil is an extraordinary remedy reserved for cases involving exceptional circumstances." *Newcrete Products v. City of Wilkes Barre,* 37 A.3d 7, 12 (Pa.Cmwlth. 2012) (*citing Lumax Indus., Inc. v. Aultman,* 543 Pa. 38, 669 A.2d 893 (1995); *Vill. at Camelback Prop. Owners Ass'n Inc. v. Carr,* 371 Pa.Super. 452, 538 A.2d 528 (1988)).

20.    "The purpose of the doctrine of piercing the corporate veil is to assess liability for the acts of a corporation to the equity holders in the corporation by removing the statutory protection otherwise insulating a shareholder from liability." *Newcrete Products,* 37 A.3d at 12 (*citing Mosaica Educ., Inc. v. Pa. Prevailing Wage Appeals Bd.,* 925 A.2d 176 (Pa.Cmwlth. 2007)).

21.    "Where a corporation operates as a mere façade for the operations of a dominant shareholder, the dominating shareholder may be held liable for the corporation's inequitable conduct perpetrated through the use of the corporate form's protections." *Newcrete Products,* 37 A.3d at 12 (*citing Carpenters Health and Welfare Fund v. Ambrose,* 727 F.2d 279 (3d Cir.1983)).

22.    In considering whether a plaintiff was "entitled to pierce the corporate veil of the LLC," the Superior Court observed that "there is a strong presumption in Pennsylvania against piercing the corporate veil." *Advanced Telephone Systems, Inc. v. Com-Net Professional Mobile Radio, LLC,* 846 A.2d 1264, 1277 (Pa.Super. 2004) (citing *Wedner v. Unemployment Board,* 449 Pa. 460, 464, 296 A.2d 792, 794 (1972)).

23.    "It has been held that the corporate veil is properly pierced whenever one in control of a corporation uses that control or corporate assets to further one's own personal interests. In such circumstances, the shareholder, in effect, pierces the corporate veil by intermingling his personal interests with the corporation's interests." *Advanced Telephone Systems, Inc.,* 846 A.2d at 1280 (*citing College Watercolor Group, Inc. v. William H. Newbauer, Inc.,* 360 A.2d 200, 207 (1976)). *See also E. Comfort Assisted Living (ECAL) IV & V v. Department of Pub. Welfare,* 2014 WL 546814 (Pa.Cmwlth 2014).

24.    "The fiction of a corporation as an entity distinct from the aggregate of individuals comprising it was designed to serve convenience and justice. There is consequently an exception recognized wherever the rule is known, namely, that the fiction will be disregarded and the individuals and corporation considered as identical whenever justice or public policy demand it and when the rights of innocent parties are not prejudiced thereby nor the theory of corporate entity made useless." *Gagnon v. Speback,* 131 A.2d 619, 621 (Pa. 1957) (*quoting Tucker v. Binenstock,* 165 A. 247, 250 (Pa. 1933)).

25.    "[T]here appears to be no clear test or well settled rule in Pennsylvania ... as to exactly when the corporate veil can be pierced and when it may not be pierced." *Advanced Telephone Systems, Inc.,* 846 A.2d at 1280 (*quoting Good v. Holstein,* 787 A.2d 426, 430 (Pa.Super. 2001)).

26.    Courts have held veil-piercing to be appropriate "when the court must prevent fraud, illegality, or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Pearson,* 247 F.3d at 484 (*quoting Zubik v. Zubik,* 384 F.2d 267, 272 (3d Cir. 1967)); *In re*

*LMCD, LLC,* 405 B.R. 555 (Bankr. M.D.Pa. 2009) *(citing Village at Camelback Property Owners Assn. Inc. v. Carr,* 538 A.2d 528 (Pa. Super 1988).

27.     The Superior Court has explained that "Pennsylvania courts will disregard the corporate entity" when the company is "used to defeat public convenience, justify wrong, protect fraud or defend a crime." *Shared Communications Servs. Of 1800-80 JFK Blvd. v. Bell Atlantic Props.,* 692 A.2d 570, 573 (Pa.Super. 1997) *(quoting Kashner v. Geisinger Clinic,* 638 A.2d 980, 984 (Pa. 1994)).

28.     "Where the court pierces the corporate veil, the owner is liable because the corporation is not a bona fide independent entity; therefore, its acts are truly his. Under the participation theory, the court imposes liability on the individual as an actor rather than as an owner. Such liability is not predicated on a finding that the corporation is a sham and a mere alter ego of the individual corporate officer. Instead, liability attaches where the record establishes the individual's participation in the tortious activity." *Wicks v. Milzoco, Inc.,* 470 A.2d 86, 89-90 (Pa. 1983).

29.     In the Pennsylvania Limited Liability Company Law, 15 Pa. C.S.A. § 8901, et seq., the Legislature stated that "in the appropriate case the doctrine of piercing the corporate veil will be applied to a limited liability company." 15 Pa. C.S.A. § 8904, Committee Comment 1994. *See also Guzzi v. Morano,* 2013 WL 4042511 (E.D. Pa. 2013) (holding piercing the corporate veil theory applies equally to limited liability companies); *In re LMcD LLC,* 405 B.R. 555 (Bankr. M.D. Pa. 2009) ("[U]nder [the Pennsylvania Limited Liability Company Law of 1994, 15 Pa.C.S.A. § 8901 et seq.], much like corporate stockholders, members are not typically liable for the obligations of the company. 15 Pa.C.S.A. § 8922. Nevertheless, the Committee Comment to 15 Pa.C.S.A. § 8904(b) makes clear that the equitable remedy of "piercing" is available regarding an LLC.")

30.     "Commonwealth Court [of Pennsylvania] has set out the factors to be considered in disregarding the corporate form as follows: [1] undercapitalization, [2] failure to adhere to corporate formalities, [3] substantial intermingling of corporate and personal affairs and [4] use of the corporate form to perpetrate a fraud. *Department of Environmental Resources v. Peggs Run Coal Co,* 55 Comwlth Ct. 312, 423 A.2d 765 (1980)." *Lumax Indus., Inc. v. Aultman,* 669 A.2d 893, 895 (Pa. 1995) *(citing Kaites v. Dept. of Environmental Resources,* 529 A.2d 1148, 1151 (Pa.Cmwlth. 1987); *see also Fletcher-Harlee Corp. v. Szymanski,* 936 A.2d 87, 95 (Pa.Super. 2007) ("While this statement of the law hardly is exhaustive, ... the Supreme Court found the factors delineated by the Commonwealth Court to be important considerations in determining whether a party overcame the strong presumption of the validity of a corporation's status as such").

31.     In addition to the factors enunciated by the Commonwealth Court, the United States District Court for the Eastern District of Pennsylvania observed that "[i]n evaluating whether or not to pierce the corporate veil, the Court must consider the following factors:

(a) gross under capitalization;
(b) failure to maintain corporate formalities;
(c) non-payment of dividends;

(d) the insolvency of the debtor corporation;

(e) siphoning of funds by a dominant stockholder;

(f) non-functioning of officers and directors;

(g) absence of corporate records;

(h) the operation of the corporation as a facade for the operations of the dominant shareholders; and

(i) the situation must present an element of injustice or unfairness."

*Schafer v. Charles Benjamin, Inc.,* 1992 WL 59152 *6-*7 (E.D. Pa. 1992) (*citing United States v. Pisani,* 646 F.2d 83, 88 (3d Cir.1981). *See also Tr. Of Nat'l Elevator Indus. Pension, Health Benefit & Educ. Funds v. Lutyk,* 140 F.Supp. 2d 407, 412-413 (E.D.Pa. 2001).

### C. The Corporate Veil Should be Pierced Under the Circumstances Presented by this Case

32. Here, all four of the factors enunciated by the Commonwealth Court of Pennsylvania are present: (1) Hermes Calgon/THG Acquisition, LLC was undercapitalized, (2) Hermes Calgon/THG Acquisition, LLC failed to adhere to company formalities, (3) Hermes Calgon/THG Acquisition, LLC substantially intermingled its assets with that of Mr. Falsetti, and (4) Hermes Calgon/THG Acquisition, LLC used the company to perpetrate fraud by paying insiders (including Mr. Falsetti and Ms. Sides who were not members, directors or unit owners) rather than pay Power Line, a known and acknowledged creditor.

### (1) Hermes Calgon/THG Acquisition, LLC Was Undercapitalized

33. A significant factor "to consider in determining whether to pierce the corporate veil" is "whether the corporation is grossly undercapitalized for its purposes." *Lutyk,* 140 F.Supp. 2d at 412.

34. If a company is undercapitalized, it is unable to "carry on its business." *Fletcher-Harlee Corp. v. Szymanski,* 936 A.2d 87, 100 (Pa.Super. 2007).

35. "Capital contributions" are "an infusion of assets into a company" and "[i]f a company is not properly capitalized, it runs the possibility of becoming insolvent." (N.T. 8/29/14, p. 29)

36. Insolvency has two definitions: (1) when a company's liabilities exceed its assets and/or (2) when a company is unable to pay its bills as they come due. (N.T. 8/29, p. 30) *See also* http://dictionary.reference.com/browse/insolvent.

37. In *U.S. v. Pisani,* 646 F.2d 83, 88 (3d. Cir. 1981), the Third Circuit permitted the piercing of the corporate veil after observing that the defendant had "followed no corporate formalities, operated the corporation with his personal funds, loaned large sums to the corporation and then repaid the loans to himself with corporate funds while the corporation was failing, and kept the corporation undercapitalized by loaning it money instead of investing equity in it."

38. Mr. Falsetti admitted that Hermes Calgon/THG Acquisition, LLC was never properly capitalized when he testified that "there was no capitalization of the company" and "there was no capitalization needs of the company."

39. Although Defendants requested that Power Line purchase the component parts and material and develop formulas for the Product Line, Mr. Falsetti testified that the capitalization needs of the company were "zero" at all times because "there was no business activity."

40. According to Mr. Falsetti, Hermes Calgon/THG Acquisition, LLC "never formalized a business," but he stated that it would have been a formal business if Shoppers had submitted a purchase order, at which time Power Line would have been paid.

41. Mr. Falsetti was issued checks totaling $100,000 from the company bank account between the time that the company was formed in late 2008 and June 2, 2009.

42. Mr. Falsetti contended that all of the money in the company was his when he testified, "I could have taken all of the money out."

43. Hermes Calgon/THG Acquisition, LLC was never was properly capitalized and was undercapitalized throughout its existence, particularly when its assets were distributed between June 5, 2009 and July 16, 2009.

**(2) Defendants Failed To Adhere to Company Formalities and Intentionally Disregarded the Company Operating Agreement**

44. The Superior Court of Pennsylvania has stated that:

> In deciding whether to pierce the corporate veil, courts are basically concerned with determining if equity requires that the shareholders' traditional insulation from personal liability be disregarded and with ascertaining if the corporate form is a sham, constituting a facade for the operations of the dominant shareholder. Thus, we inquire, *inter alia,* whether corporate formalities have been observed and corporate records kept, whether officers and directors other than the dominant shareholder himself actually function, and whether the dominant shareholder has used the assets of the corporation as if they were his own.

*Fletcher-Harlee Corp.,* 936 A.2d at 96 (*citing Carr* at 538 A.2d 532-533).

45. The Third Circuit has observed that "[n]ot every disregard of corporate formalities or failure to maintain corporate records justifies piercing the corporate veil." *Kaplan v. First Options of Chicago, Inc.,* 19 F.3d 1503, 1521 (3d Cir.1994).

46. In determining whether to pierce the corporate veil, the disregard of the corporate formalities must lead "to some misuse of the corporate form." *Advanced Telephone Systems, Inc.,* 846 A.2d at 1279.

47. The United States District Court for the Eastern District of Pennsylvania in *Schafer, supra,* permitted the piercing of the corporate veil after determining that the defendant corporations had not maintained the corporate formalities because they failed to produce and maintain articles of incorporation, hold shareholder meetings or directors' meetings, or declare dividends. The court further noted that the "officers and directors of the companies appear to have had no useful corporate function" and

202       BUCKS COUNTY LAW REPORTER

2016 BCBA      **Power Line v. Hermes Calgon/THG**     [89 Bucks Co. L. Rep.

"the corporations lacked records which one would normally expect a corporation to maintain." *Schaffer,* 1992 WL 59152 at *7.

48.     Hermes Calgon/THG Acquisition, LLC failed to follow the basic requirements of an LLC in that, *inter alia,* it held no directors' meetings and there were no minutes from any company meeting, including the alleged formation meeting, for which there was no record that it actually occurred.

49.     Two of the three directors, Sherri Falsetti and Regina Massad, did not participate in the direction, management and control of the business in any way and, therefore, had no useful company function.

50.     Pursuant to 15 Pa.C.S. § 8903, Committee Comment—2001, "[t]he management of a limited liability company may be delegated in whole or in part pursuant to 15 Pa.C.S. § 8941 to managers who need not be members. If management is so delegated, public notice of that fact is required to be given in the certificate of organization by 15 Pa.C.S. § 8913(5)."

51.     Mr. Falsetti was not a member, a director or a unit holder of Hermes Calgon/THG Acquisition, LLC, but he was the apparent principal person in charge of the company and had control over the finances of the company.

52.     Under Article 5 "Management and Control of the Company" of the Limited Liability Company Agreement for Hermes Calgon/THG Acquisition, LLC, Paragraph 5.1, "Management of the Company by the Board of Directors," states that "[t]he Company is a manager-managed limited liability company, and the managers are the Board of Directors, acting as a board of directors in accordance with this Agreement."

53.     If Mr. Falsetti was the manager or "member-manager" of Hermes Calgon/THG Acquisition, LLC, as he was designated on the Schedule K-1 of the company tax return, the company should have complied with the aforesaid requirements of 15 Pa.C.S. § 8941 and 15 Pa.C.S. § 8913(5).

54.     The company operating agreement did not list Mr. Falsetti as the manager, and Hermes Calgon/THG Acquisition, LLC did not comply with the requirements of 15 Pa.C.S. § 8941 and 15 Pa.C.S. § 8913(5).

55.     Ms. Sides and Mr. Falsetti did not make any capital contribution to Hermes Calgon/THG Acquisition, LLC, but significant company funds were eventually distributed to them.

56.     Due to Mr. Falsetti's inability and/or reluctance to explain where the initial funds for the company came from or who contributed them, this Court did not find Mr. Falsetti credible in this regard.

57.     Although the Operating Agreement states that the two members who contributed capital to the company (and the amount of their contributions) were RSB, LLC ($583,333.35) and Mr. Pettinato ($166,666.65), neither the general ledger nor the company tax return support that representation.

58.     Despite the existence of company documents with a multitude of names on them (e.g., Hermes, LLC; Solebury Brands, LLC; Dana Holdings LLC; Hermes, LLC D/B/A Solebury Brands LLC; Solebury Brands; and SoleburyBrands), Defendants did not provide Power Line with any documentation that had the name Hermes Calgon/THG Acquisition, LLC on it.

59. Ms. Barry did not know the name of the company (Hermes Calgon/THG Acquisition, LLC) on whose behalf she was allegedly working, believing instead that it was Solebury Brands.

60. Since Defendants failed to adhere to the necessary formalities, since the company was undercapitalized, and since company funds were distributed to individuals who were not members of Hermes Calgon/THG Acquisition, LLC, the corporate veil should be pierced.

61. This Court agrees with Plaintiff's expert accounting witness, Mr. Fascia, who observed, "Ironically, the individual defendants in this case seek to shield themselves from personal liability by contending, among other things, that the company which Falsetti once testified was never solidified, now exists in order to avoid liability to Power Line." (*See* N.T. 8/29/14, pp. 67-68)

**(3)** **Hermes Calgon/THG Acquisition, LLC was an Alter Ego of Mr. Falsetti, Who, Without Distinction, Commingled Company Funds with his Personal Funds**

62. In order for a company's participants to be shielded from personal liability, the participants must remain distinct and separate from the company.

63. "The use of corporate funds for personal benefita—again, particularly at a time of financial distress—also supports piercing the corporate veil." *Lutyk,* 140 F.Supp. 2d at 459. *See also Schaffer,* 1992 WL 59152 at *7 (piercing corporate veil where president and sole stockholder of corporation used corporate funds to pay rent on personal residence and make personal insurance payments); *Norris v. Jasper,* 1987 WL 582711 (C.P. Phila. 1987) (finding intermingling of assets where "[c]orporate assets were removed as 'needed' and the corporate entity assumed liability for joint debts involving [its shareholder].").

64. The corporate entity can sometimes be justifiably pierced, such as when the person in control of a corporation uses that control or corporate assets to further his own personal interests. *College Watercolor Group, Inc.,* 360 A.2d at 207. "In such circumstances, the shareholder, in effect, pierces the corporate veil by intermingling his personal interests with the corporation's interests." *Id.*

65. Mr. Falsetti admitted that the company was his alter ego when he testified at trial that, at his sole option, "I could have taken all of the money out [of the company]."

66. The loan from Ms. Sides to Mr. Falsetti—and not to Hermes Calgon/THG Acquisition, LLC—also is clear evidence of alter ego and commingling. Although Hermes Calgon/THG Acquisition, LLC had no repayment obligations to Ms. Sides, Mr. Falsetti directed that company funds were to be used to make interest payments on the loan that she made to him.

67. Mr. Falsetti did not directly contribute any money to Hermes Calgon/THG Acquisition, LLC, but $263,072.91 was distributed from the company to him and he contended that he could have taken more. (*See* N.T. 2/4/14, p. 231)

68. Hermes Calgon/THG Acquisition, LLC was an alter ego of Mr. Falsetti.

204                    BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**      [89 Bucks Co. L. Rep.

**(4)    The Company was Used to Perpetrate Fraud, and Defendants Intentionally Rendered It Insolvent**

69.    Defendants acknowledged their debt obligations to Power Line as confirmed by Mr. Falsetti's email response on June 5, 2009 to Ms. Santucci, after she wrote to Mr. Falsetti stating that Shoppers never agreed to the Product Line.

70.    Mr. Falsetti's response ("Sandy, *given our manufacturing commitments* and current production of good for end July ship .....this will kill the company. *The goods are unique to the exclusive and paid for by us*") constitutes admissions, since Mr. Falsetti's statements confirmed that there were "manufacturing commitments" and that Defendants intended for the "goods" to be "paid for by us."

71.    Mr. Pettinato's repetitive requests for invoices and consistent representations to Power Line that they would be paid constituted an acknowledgement of Defendants' debt to Power Line.

72.    On June 5, 2009, the date that Mr. Falsetti wrote to Ms. Santucci and acknowledged that there were "manufacturing commitments," the balance in the Hermes Calgon/THG Acquisition, LLC Wachovia bank account was $152,362.85. (*See* Exhibit P-40)

73.    According to Power Line's expert, Peter Fascia, CPA, Esq., LL.M., as of June 5, 2009, the company was both capitalized and solvent because its assets exceeded any obligations, including those to Power Line. (N.T. 8/29/14, pp. 34-35)

74.    Over the next 41 days, the following payments (among others) were made from the company bank account:

| 6/5/09 | Joseph Falsetti | $25,000.00 |
|---|---|---|
| 6/5/09 | Frank Pettinato | $10,000.00 |
| 6/8/09 | Laura Barry | $ 5,699.00 |
| 6/8/09 | Brian Bradley | $37,500.00 |
| 6/19/09 | Joseph Falsetti | $25,000.00 |
| 6/29/09 | Joseph Falsetti | $25,000.00 |
| 7/2/09 | Simon Brown | $ 2,978.73 |
| 7/7/09 | Laura Barry | $ 4,000.00 |
| 7/7/09 | Joseph Falsetti | $ 8,000.00 |
| 7/16/09 | Aetna Health Ins. | $ 5,754.20 |
| | TOTAL | $148,901.93 |

(Exhibit P-26; P-40)

75.    As of July 16, 2009, the balance in the company bank account was only $1,534.77. (Exhibit P-40)

76.    As of that date, the company was insolvent because its liabilities exceeded its assets, and it could not pay Power Line for the expenditures it had incurred for the purchase of materials and for development of the Product Line.

77.    18 Pa.C.S. § 8974, Distribution of assets upon dissolution, states:

**(a) General rule.**—In settling accounts after dissolution, the liabilities of the limited liability company shall be entitled to payment in the following order:

(1) Those to creditors, including members or managers who are creditors, in the order of priority as provided by law, in satisfaction of the liabilities of the company, whether by payment or the making of reasonable provision for payment thereof, other than liabilities for distributions to members under section 8932 (relating to distributions and allocation of profits and losses) or 8933 (relating to distributions upon an event of dissociation).

(2) Unless otherwise provided in the operating agreement, to members and former members in satisfaction of liabilities for distributions under section 8932 or 8933.

(3) Unless otherwise provided in the operating agreement, to members in respect of:

(i) Their contributions to capital.

(ii) Their share of the profits and other compensation by way of income on their contributions.

**(b) Provision for claims.**—A company that has dissolved shall pay or make reasonable provision to pay all claims and obligations, including all contingent, conditional or unmatured claims and obligations, known to the company and all claims and obligations that are known to the company but for which the identity of the claimant is unknown. If there are sufficient assets, such claims and obligations shall be paid in full, and any such provision for payment made shall be made in full. If there are insufficient assets, such claims and obligations shall be paid or provided for according to their priority and, among claims and obligations of equal priority, ratably to the extent of assets available therefor. Unless otherwise provided in the operating agreement, any remaining assets shall be distributed as provided in this chapter. Any liquidating trustee winding up the affairs of a company who has complied with this section shall not be personally liable to the claimants of the dissolved company by reason of his actions in winding up the company.

78.     Upon dissolution of the LLC, then, debts owed to creditors such as Power Line are to be paid first before any remaining equity may be distributed to the members of the LLC.

79.     Defendants seek to avoid payment to Power Line by arguing that Hermes Calgon/THG Acquisition, LLC no longer has funds to pay Power Line.

80.     Mr. Falsetti, Mr. Pettinato, and others depleted the cash of Hermes Calgon/THG Acquisition, LLC, which was the company's most significant and liquid asset.

206　　　　　　　BUCKS COUNTY LAW REPORTER

2016 BCBA　　　Power Line v. Hermes Calgon/THG　　　[89 Bucks Co. L. Rep.

81. As a result of the depletion of its cash by Mr. Falsetti and Mr. Petinato, Hermes Calgon/THG Acquisition, LLC became insolvent and was unable to pay Power Line.

82. Defendants purposely and systematically created the company's insolvency.

83. Despite acknowledging the obligation to pay Power Line, Defendants instead paid themselves.

84. Defendants claim that they have no obligation to pay Power Line because their relationship with Power Line was that of a "joint venture."

85. Defendants did not have a "joint venture" with Power Line, because in addition to Mr. Falsetti's email to Sandy Santucci at Shoppers admitting that the "goods" were to be "paid for" by Defendants (and not contingent upon Shoppers issuing a purchase order), Power Line specifically revised the initial Confidentiality Agreement sent by Mr. Pettinato to Mr. Parker to remove all references to an investment or a joint partnership.

86. In stating that he was "good with [the] changes" that Power Line made to the Confidentiality Agreement, Mr. Pettinato consented to the modification, and he believed that Mr. Parker appropriately modified the Confidentiality Agreement to reflect a vendor relationship and not an investment relationship.

87. Power Line was therefore a vendor for Defendants.

88. Other individuals and vendors were reimbursed for their costs and paid for their expenses, including Mr. Pettinato, Ms. Barry and vendors such as Sharon Ingarra (graphic design) and member Simon Brown's company.

89. The Superior Court of Pennsylvania has stated that "[i]t is clear that any definition of fraud necessarily includes a knowing misrepresentation of a fact by one party which induced another party to act or to fail to act, which, in the end, caused damage to the party who relied upon the misrepresentation." *Fletcher-Harlee Corp.,* 936 A.2d at 100.

90. Defendants made intentional misrepresentations to induce Power Line to purchase materials and develop formulas for the Product Line. Power Line reasonably relied upon those misrepresentations.

91. At trial, several misrepresentations were identified.

**(a) Misrepresentations in Defendants' PowerPoint Presentation**

92. In the PowerPoint presentation, Defendants represented that "The Company's U.S. based success is in partnership with America's largest drug sector retailer Walgreens with excess of 6,000 stores across the country."

93. Despite those representations, Defendants did not have a partnership with Walgreens, nor did Defendants have any communications with Walgreens to sell the Product Line.

94. Despite the representation that Defendants had "U.S. based success," Mr. Pettinato admitted that Solebury Brands, the company represented in the PowerPoint presentation, had had no success up to that point.

95.     Defendants' representation in the PowerPoint presentation that the partnership with Walgreens was "schedule[d] to hit stores in August of this year," was false, and there never was a schedule to sell the Product Line to Walgreens.

96.     After reviewing the representations, Power Line reasonably believed that Defendants had a partnership with Walgreens, that the Defendants' company had U.S. based success, and that the Product Line was scheduled to be sold in Walgreens in August, 2009.

97.     Defendants' statement in the PowerPoint presentation that "Shoppers Drug Mart first shipment is June of 2009..." was false, as there never was a firm commitment from Shoppers Drug Mart to sell the Product Line and Hermes Calgon/ THG Acquisition, LLC and Shoppers Drug Mart never had a written contract.

98.     After reviewing the representations regarding Shoppers, Power Line reasonably believed that Defendants had an agreement to sell the Product Line to Shoppers and that the first shipment would be in June, 2009.

99.     As a result of Defendants' representation in the PowerPoint presentation that "we anticipate no further capital needs beyond this funding, as we are immediately profitable." Ms. Johanningsmeier reasonably believed "that there was money to pay [Power Line]."

### (b)  Misrepresentations in Defendants' "Official Company Info" Email

100.    The "Official Company Info" email that Mr. Pettinato sent to Power Line, which he wanted Ms. Johanningsmeier to read and believe, contained false information.

101.    The following information in the "Official Company Info" was inaccurate: (a) "Legal Name" of the company; (b) "D/B/A" of the company; (c) "Federal ID#" of the company; and (d) "Business Type" of the company.

102.    Although Defendants were aware that the "Official Company Info" email contained misinformation, they did nothing to correct any of the information contained in the document or to advise Power Line of the inaccurate information.

### (c)  Defendants' Intention to Induce Action by Power Line

103.    On March 18, 2009—the same day that Ms. Santucci stated to Ms. Barry "I need you to review the strategy" of the Product Line—Mr. Pettinato sent an email to Mr. Parker at Power Line that stated "We need to place orders to Tube guy ASAP to hit dates."

104.    Mr. Parker reasonably believed that this email indicated that Mr. Pettinato "had a specific date in mind" which required immediate action by Power Line to "get the order done."

105.    Mr. Pettinato's statement was false, and he knew it was false, because there were no "dates" in place that needed to be "hit."

106.    Mr. Parker reasonably relied upon that statement and placed orders for component parts for the Product Line.

107.    Defendants never paid Power Line for those materials.

208          BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

### (d)  Power Line's Justifiable Reliance

108.    After reviewing the PowerPoint, Ms. Johanningsmeier researched Dana Holdings, LLC—the name at the bottom of every page of the document—and learned that it was an investment company owned by Mr. Falsetti.

109.    Ms. Johanningsmeier also researched Hermes, LLC—the name on the "Official Company Info" email—and learned that it was an investment company that had assets valued at $17 million.

110.    After reviewing the documents provided by the Defendants and performing her own research, Ms. Johanningsmeier was satisfied that Defendants had the funds and finances to pay for the Product Line.

### (e)  Misrepresentations are not "Aspirations"

111.    Although Defendants do not deny that false information was provided to Power Line, they contend that the inaccurate information was an "aspirational strategy of future state" and "a vision of the plan of the company in the future, our vision of growth."

112.    The PowerPoint presentation did not state or imply anywhere that it was "an aspirational document" or anything similar in nature.

113.    The PowerPoint presentation and the "Official Company Info" email were intentional misrepresentations by Defendants that were made to Power Line in order to induce it to act.

114.    Power Line reasonably relied upon Defendants' misrepresentations to its detriment and suffered damages as a result of its purchase of materials and its development of the Product Line.

115.    Defendants have used the company to attempt to avoid making payment to Power Line, and are attempting to perpetrate fraud by asking the Court to permit them to keep the money which was distributed to them rather than being used to pay Power Line.

### D.    Defendants are Liable to Power Line Under the Doctrine of Piercing the Corporate Veil

116.    Since Hermes Calgon/THG Acquisition, LLC was undercapitalized, since it substantially intermingled its assets with that of Mr. Falsetti, since Defendants failed to adhere to company formalities, and since Defendants used the company to perpetrate a fraud by paying insiders rather than pay its vendor, Power Line, Defendants' corporate veil should be pierced.

117.    Defendants Mr. Falsetti and Mr. Pettinato, who are either the principal equity holders, directors or apparent individuals in control of Hermes Calgon/THG Acquisition, LLC, are held individually liable to Power Line.

118.    Although Ms. Barry held the title of Vice President of Marketing for the Solebury Brands, her title alone is not a sufficient basis to determine her liability. *See e.g. Franklin Cnty. Deputy Sheriff's Ass'n v. Pennsylvania Labor Relations Bd.,* 885 A.2d 613, 616 (Pa.Cmwlth. 2005) ("job titles or descriptions alone are inadequate to overcome the [Pennsylvania Labor Relations] Board's requirement that it make unit determinations based on actual job functions").

119.    Ms. Barry was not an equity holder, officer, director or in control of Hermes Calgon/THG Acquisition, LLC, and is therefore not individually liable to Power Line.

### E.    Defendants are Liable to Power Line under the Doctrine of Fraudulent Misrepresentation

120.    The elements of fraudulent misrepresentation are: (1) a misrepresentation; (2) a fraudulent utterance thereof; (3) an intention to induce action thereby; (4) justifiable reliance thereon; and (5) damages as a proximal result. *Wilson v. Donegal Mut. Ins. Co.,* 598 A.2d 1310, 1315 (Pa.Super. 1991).

121.    Power Line reasonably and justifiably relied upon the misrepresentations made by Defendants in various statements to Power Line, including the PowerPoint presentation and the "Official Company Info" email, all of which Defendants knew were false and were intended to induce Power Line to act in furtherance of the development and production of the Product Line.

122.    As a result of that reliance, Power Line suffered damages due to the purchase, manufacture and storage of materials and the development of formulas for the Product Line, for which Defendants have not paid.

### F.    In the Alternative, Power Line Reasonably Relied Upon Defendants' Negligent Misrepresentations

123.    Alternatively, although Defendants' misrepresentations appear to be intentional, Defendants misrepresentations were, at least, negligent.

124.    The elements of negligent misrepresentation are: (1) a misrepresentation of material fact; (2) the representor knows of the misrepresentation or makes the misrepresentation without knowledge as to its truth or falsity or makes the representation under circumstances where the representor ought to know of its falsity; (3) the representor intends the representation to induce action; and (4) injury due to justifiable reliance upon the misrepresentation. *Halper v. Jewish Family & Children's Serv.,* 963 A.2d 1282 (Pa. 2009).

125.    When Mr. Falsetti drafted the PowerPoint, which Mr. Pettinato and Ms. Barry reviewed, and when Mr. Pettinato sent various emails containing inaccurate information to Power Line, Defendants knew or should have known that the representations were inaccurate.

126.    For example, Defendants knew or should have known that they did not have a contract to sell the Product Line to Walgreens and Shoppers, that Hermes Calgon/THG Acquisition had no "U.S. based success," that the company they were working on behalf of was not "Hermes, LLC," and that there were no product shipment "dates" to "hit."

127.    Defendants made the misrepresentations in order to induce Power Line to proceed with the purchase of materials and develop the Product Line.

210                           BUCKS COUNTY LAW REPORTER

2016 BCBA          **Power Line v. Hermes Calgon/THG**          [89 Bucks Co. L. Rep.

128.    PowerLine reasonably and justifiably relied upon those misrepresentations to conclude that Hermes Calgon/THG Acquisition, LLC was a legitimate business that was able to pay for the expenses Power Line incurred in the purchase of materials and development of the Product Line.

## F.    Breach of Contract

129.    To successfully maintain a cause of action for breach of contract, plaintiff must establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract, and (3) resultant damages. *Albert v. Erie Ins. Exchange,* 65 A.3d 923, 928 (Pa. Super. 2013).

130.    There was no written contract between Defendants and Power Line, and the evidence presented did not sufficiently establish written essential terms of the agreement between the parties.

## G.    A Contract Implied in Fact, However, Was Formed Between Defendants and Power Line

131.    "An express contract is formed when the terms of an agreement are declared by the parties either verbally or in writing. However, even where no such clear declaration exists, a contract may nevertheless be implied-in-fact." *Braun v. Wal-Mart Stores, Inc.,* 24 A.3d 875, 942 (Pa.Super. 2011) aff'd, 106 A.3d 656 (Pa. 2014).

132.    "A contract, implied in fact, is an actual contract which arises where the parties agree upon the obligations to be incurred, but their intention, instead of being expressed in words, is inferred from their acts in the light of the surrounding circumstances. *Cameron v. Eynon,* 332 Pa. 529, 3 A.2d 423 (1939)." *Martin v. Little, Brown & Co.,* 450 A.2d 984, 987 (Pa.Super. 1981) (*citing Home Protection Building & Loan Association Case,* 17 A.2d 755, 756 (Pa. Super. 1941).

133.    "An implied contract is an agreement which legitimately can be inferred from the intention of the parties as evidenced by the circumstances and 'the ordinary course of dealing and the common understanding of men.'" *Id.* (*citing Hertzog v. Hertzog,* 29 Pa. 465, 468 (1857)).

134.    A contract implied in fact "can be found by looking to the surrounding facts of the parties' dealings." *Rissi v. Cappella,* 918 A.2d 141, 140 (Pa. Super. 2007) (*citing Ingrassia Const. Co., Inc. v. Walsh,* 486 A.2d 478, 483 (Pa.Super. 1984)).

135.    "Generally, there is an implication of a promise to pay for valuable services rendered with the knowledge and approval of the recipient, in the absence of a showing to the contrary. A promise to pay the reasonable value of the service is implied where one performs for another, with the other's knowledge, a useful service of a character that is usually charged for, and the latter expresses no dissent or avails himself of the service." *Martin,* 450 A.2d at 987 (*citing Home Protection Building & Loan Association Case,* 17 A.2d at 756–57).

136.    "A promise to pay for services can, however, only be implied when they are rendered in such circumstances as authorized the party performing to entertain a

reasonable expectation of their payment by the party benefited. The service or other benefit must not be given as a gratuity or without expectation of payment, and the person benefited must do something from which his promise to pay may be fairly inferred." *Id.*

137.    "In Pennsylvania, a contract implied in fact differs from an express contract only in the manner of its formation and has the same legal effect as an express contract." *Mun. Auth. of Borough of Midland v. Ohioville Borough Mun. Auth.,* 108 A.3d 132, 138 (Pa.Cmwlth. 2015) (*citing Ingrassia Constr. Co.,* 486 A.2d at 483 n. 7).

138.    "While a complaint must include the facts upon which a plaintiff's claims are based, 'a plaintiff is not obliged to identify the legal theory underlying his complaint,' and there is no requirement that a plaintiff title a count with the specific cause of action alleged thereunder." *Advanced Surgical Servs., Inc. v. Innovasive Devices, Inc.,* No. 1637, 2001 WL 1807408 *1-2 (C.P. Philadelphia Nov. 8, 2001) (*citing Weiss v. Equibank,* 313 Pa.Super. 446, 453, 460 A.2d 271, 275 (1983)). *See also Cardenas v. Schober,* 783 A.2d 317, 324-25 (Pa.Super. 2001) ("We have held that it is not necessary that the plaintiff identify the specific legal theory underlying the complaint").

139.    "The obligation to discover the cause or causes of actions is on the court: the plaintiff need not identify them". *Id.* (*citing McClellan v. Health Maint. Org. of Pa.,* 413 Pa.Super. 128, 142, 604 A.2d 1053, 1060 (1992)).

140.    Power Line clearly communicated to Defendants that it was not a co-investor in the development of the Product Line, but instead was a vendor to Defendants that expected to bill, and receive payment from, Defendants for the services it rendered in developing the Product Line and purchasing and storing the associated materials and supplies.

141.    Defendants clearly communicated to Power Line their intention to pay for the services and materials rendered by Power Line.

142.    Although Plaintiff did not plead a cause of action for a contract implied in fact, this Court has determined that a contract implied in fact existed between Defendants and Power Line.

## H.    Power Line's Damages

143.    Power Line purchased $62,137.21 worth of materials that are useless, and for which Power Line is entitled to be reimbursed.

144.    Power Line has stored all of the materials at a cost of more than $7,000 as of the time of trial.

145.    Power Line performed many hours of work on the formulations for the Product Line, which was done at the direction of the defendants, for which Power Line has billed Defendants $30,000.

146.    The value of the specification work up, press checks and design work was $2,000.

147.    The gross total loss to Power Line as of the time of trial, therefore, was $101,137.21.

212                                    BUCKS COUNTY LAW REPORTER

2016 BCBA              **Power Line v. Hermes Calgon/THG**        [89 Bucks Co. L. Rep.

## I.    Prejudgment Interest

148.    "The determination of whether to award pre-judgment interest and the rate of such interest is left to the sound discretion of the trial court in equity." *Gurenlian v. Gurenlian,* 595 A.2d 145, 148 (1991) (*citing Sack v. Feinman,* 413 A.2d 1059, 1065-66 (Pa. 1980); *Park v. Greater Delaware Valley Sav. & Loan Ass'n,* 523 A.2d 771, 774 (Pa.Super. 1987)).

149.    "Our courts have generally regarded the award of prejudgment interest as not only a legal right, but also as an equitable remedy awarded to an injured party at the discretion of the trial court." *Kaiser v. Old Republic Ins. Co.,* 741 A.2d 748, 755 (Pa.Super. 1999) (*quoting Somerset Community Hospital v. Allan B. Mitchell & Associates,* 685 A.2d 141, 148 (Pa.Super. 1996)).

150.    The Superior Court of Pennsylvania has stated that:

> [w]hile the general rule is that a successful litigant is entitled to interest beginning only on the date of the verdict, it is nonetheless clear that pre-judgment interest may be awarded "when a defendant holds money or property which belongs in good conscience to the plaintiff, and the objective of the court is to force disgorgement of his unjust enrichment." *Dasher v. Dasher,* 542 A.2d 164, 164-65 (Pa.Super. 1988) (quoting *Sack v. Feinman,* 413 A.2d 1059, 1065 (Pa. 1980)). Pre-judgment interest in such cases is a part of the restitution necessary to avoid injustice. *Dasher,* [542 A.2d] at 165.

*Kaiser v. Old Republic Ins. Co.,* 741 A.2d 748, 755 (Pa. Super. 1999).

151.    The legal rate of interest is established by the Act of January 30, 1974, P.L. 13, No. 6, § 202, 41 Pa.S. § 202, as follows:

> Reference in any law or document enacted or executed heretofore or hereafter to "legal rate of interest" and reference in any document to an obligation to pay a sum of money "with interest" without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.

*Ball v. Rolling Hill Hosp.,* 518 A.2d 1238, 1246 (Pa.Super. 1986).

152.    Here, the amount of damages is a fixed and readily ascertainable sum of money.

153.    In awarding damages to Power Line, interest should be calculated at the annual rate of 6% from the date that the payment was due. *See e.g., Cresci Constr. Srvs., Inc. v. Martin,* 64 A.3d 254 (Pa.Super. 2013) (*citing Penneys v. Pennsylvania R.R.Co.,* 183 A.2d 544 (Pa. 1962)).

154.    At the Defendants' request, Power Line mailed invoices on June 30, 2009.

155.    Therefore, payment from Defendants to Power Line was due on July 30, 2009.

156.    From July 30, 2009 to the date of this Decision and Order, September 29, 2015, prejudgment interest in the amount of $37,450.76 is due and owing, plus $16.63 per day thereafter.

### IV. CONCLUSION

In consideration of statutory and decisional law as stated, and our findings of fact, this Court has concluded that Defendants Hermes Calgon/THG Acquisition, LLC, Franco S. Pettinato and Joseph Falsetti have been unjustly enriched as a result of their failure, in their roles as the director and the individual principally in charge of Hermes Calgon/THG Acquisition, LLC, to pay Plaintiff Power Line for the expenses it has incurred, at Defendants' request, in developing the Product Line and purchasing requisite materials and supplies. In addition, this Court has determined that the corporate veil should be pierced and Defendants Mr. Pettinato and Mr. Falsetti should be held individually liable with Defendant Hermes Calgon/ THG Acquisition, LLC to Power Line for the losses it has incurred as a result of Defendants' actions. Accordingly, an equitable remedy of an award of restitution is appropriate. Power Line should be awarded the sum of $101,137.21, plus prejudgment interest of $37,450.76, for a total award of $138,587.97. In addition, interest in the amount of $16.63 per day after the date of this Order, in addition to storage fees of $138.70 per month from October 2014 are to be added to the award.

Accordingly, the following verdict is entered:

### ORDER

**AND NOW,** this 30th day of September, 2015, upon consideration of the Complaint of Plaintiff, Power Line Packaging, Inc., alleging claims against Defendants, Hermes Calgon/THG Acquisition, LLC, Franco S. Pettinato and Joseph Falsetti, for unjust enrichment, quantum meruit and piercing the corporate veil, and the testimony and evidence received during evidentiary hearings on this matter, it is hereby **ORDERED** and **DECREED** that Plaintiff is awarded the sum of $101,137.21 in addition to prejudgment interest of $37,390.29, for a total award of $138,527.75 in restitution. In addition, interest in the amount of $16.63 per day after the date of this Order, and additional storage fees of $138.70 per month from October 2014 are to be added to the award in restitution.

BY THE COURT
/s/Gary B. Gilman
GARY B. GILMAN, J.